MASSACHUSETTS, The (JONES v.). See Case No. 7,480.

MASSACHUSETTS ARMS CO. (COLT v.). See Case No. 3,030.

## Case No. 9,259.

### In re MASSACHUSETTS BRICK CO.

[2 Lowell, 58; [1] 5 N. B. R. 408; 4 Am. Law T. 220.]

District Court, D. Massachusetts. Aug., 1871.

BANKRUPTCY—SUSPENSION OF COMMERCIAL PAPER
—INSOLVENCY—ADVANCES—MORTGAGE
—ESTOPPEL.

1. The stockholders of a trading corporation agreed to lend money to the company in proportion to their several shares. One of them

[1] [Reported by Hon. John Lowell. LL. D., District Judge, and here reprinted by permission.]

made the loan by giving his note, which the company indorsed, and agreed with him to provide for at maturity. They failed to take up the note when it became due, and the promisor paid it within fourteen days after its maturity. *Held*, that there had been no suspension of the commercial paper of the company for fourteen days.

2. Where stockholders were to advance money to the company in proportion to their interests, and did so advance it on a credit of four months, and all but one of them afterwards extended their loans for one year, in accordance with what the treasurer testified was an understanding at the time the loans were made, and the company paid all its trade debts as they matured, and was in good credit, whether it could be properly considered insolvent, quaere.

3. At a meeting of the stockholders, who were also the principal creditors of the company, it was voted unanimously to give a mortgage to one of the stockholders to secure him for advances made beyond his proportion. The petitioner, who was a stockholder and creditor, was present, and made no objection. *Held*, he was estopped to set up the mortgage as an act of bankruptcy by the corporation.

[Cited in Re Hapgood, Case No. 6,044; Re Williams, Id. 17,706; Re Sawyer, Id. 12,-394; Re Kraft, 3 Fed. 893.]

The Massachusetts Brick Company was incorporated in May, 1869, for the purpose of manufacturing bricks in Somerville and Medford, with a right to have a capital stock not exceeding $500,000, of which $300,000 might be in real estate. The evidence tended to show that the capital stock had been fixed at $400,000, of which about $350,000 had been paid in, and that in July, 1870, it was found that so much of this had been invested in land and machinery, that the operations of the company were embarrassed for the want of active capital. Thereupon certain of the shareholders, of whom the petitioner was one, signed this agreement: "The undersigned, stockholders in the Massachusetts Brick Company, hereby agree to furnish the treasurer, in proportion to the amount of stock held by them, whatever money may be required to pay the present indebtedness, at ten per cent interest per annum, provided that not over $75 per share shall be required on the amount subscribed to raise $150,000 in full."

The petitioner accordingly lent the treasurer of the corporation $5,000, and took the note of the company at four months, as did others. Some of the stockholders lent their notes on four months, and took a receipt from the treasurer that the company was to pay them at maturity. When the note held by the petitioner came due in December, 1870, he agreed to extend the loan, and lent the treasurer his note at four months, taking from him a receipt that the company were to provide payment for it at maturity, it being given for their accommodation. The petitioner offered evidence tending to show that he informed the treasurer that he should not renew the loan again, but should expect the company to pay the note at maturity, which would be the 4th of April, 1871.

The stockholders advanced different sums, not regulated precisely by the number of

their shares, and Oliver Ames, the largest holder, advanced $90,000, which was $30,-000 more than his proportion.

The treasurer testified that there was an understanding among the contributors that the money should not be called for until the company should be able to pay it, and that they should all share alike.

Early in 1871, at an adjournment of the annual meeting of the stockholders of the company, at which the petitioner was present, Mr. Ames presented a proposition: That if a mortgage were given him for the excess which he had advanced above his share, he would "carry" $60,000 for one year, if the other stockholders would do likewise. This proposition was accepted unanimously.

All the stockholders, excepting the petitioner, afterwards signed an agreement to extend their several debts, but he refused to sign it. When his note became due, it was not paid by the company, nor were funds furnished him by them, and he took it up within fourteen days after its maturity. He has sued the company at law, and in this petition sets up the non-payment of this note and the mortgage to Ames as acts of bankruptcy.

The treasurer testified that the company owed very few debts, excepting to its shareholders, and met all its ordinary obligations promptly, and was in good credit; that it could pay this debt, but considered that the petitioner was bound to wait.

E. Avery, for petitioners.
D. W. Gooch, for respondents.

LOWELL, District Judge. This case has all the appearance of an attempt to coerce the payment of a disputed debt, by an attack on the commercial standing of a trading corporation. Nevertheless, if that corporation has suspended payment of its commercial paper, and there is no real dispute of its validity, or if it is bankrupt for any other reason, the powers of the court are rightly invoked. I am of opinion that there is no commercial paper of the company overdue. The debt to the petitioner is for money paid to take up his own note, which he had lent to the company; that debt does not depend upon the company's indorsement of the note, but upon the fact that money has been paid in their behalf. If there had been no indorsement, the right of action would be the same in fact and in form. When the petitioner took up his own note, it was paid, and he neither need to nor can declare upon it as still outstanding. He lent it to the company for the very purpose of having it discounted as his note, and not as theirs, and his obligation was always that of a promisor, and intended to be so, and their obligation to the holder was merely that of an indorser. Their obligation to this petitioner was truly represented by the receipt, which agreed to save him harmless; and, as soon as he was damni-

fied, he had a good cause of action for money paid, but not upon a promissory note; and as the note was taken up within fourteen days after it was due, there never was any suspension for that period.

A more difficult question is, whether in March, 1871, when the mortgage to Ames was given, the company were insolvent, and intended the mortgage to be a preference. There is evidence that they needed money to carry on their business; and, if we leave out of view the fact that the great body of their creditors were their own stockholders, and hold the debts of this class to be ordinary trade debts, there is certainly much ground to say that they were insolvent. The petitioner maintains that these are ordinary debts; but it is quite apparent that the whole object and purpose of these loans was to enable the company to carry on its business, and that it would frustrate this purpose to require them to be repaid on demand, or even in four months, and, therefore, it may be presumed that most of the lenders had not the slightest intention of treating their loans in that way. I do not mean to say that they had not a legal right to demand payment, but they had no intention of pressing their demands at the risk of the insolvency of the company, which was precisely what they were seeking to avoid. When, therefore, all, excepting the petitioner, agreed to extend their loans for one year, the question of insolvency was perhaps adjourned for that time. This was the way it struck me at the hearing, as I then intimated. Here was a company in good credit, meeting all its trade debts, but having what the treasurer swears to have been, and the other members, excepting the petitioner, appear to have considered, a sort of permanent loan. I fear it might be straining a point to say that this company was insolvent, so that whatever payments it made or security it gave must be taken to be acts of bankruptcy, if attacked within four months. It is the result, undoubtedly, when traders are wholly insolvent, and generally known to be so, that all dealings with them, excepting for present considerations, are liable to be avoided, if they are objected to within the prescribed time.

But another ground exists in this case for saying that the petitioner cannot rely on this act of bankruptcy. The corporation, at a meeting at which he was present, voted to give this security; and he did not dissent, and, indeed, so far as appears, assented. It has been held that the vote cannot affect the private rights of stockholders, in their dealings with the corporation, if they were not present and did not assent, and had no notice of the vote until it was too late to affect action under it, though the meeting was a legal meeting: American Bank v. Baker, 4 Metc. [Mass.] 164.

But here the petitioner was present, and did assent, or did not dissent, and had full notice of the vote. It may be said that it would be useless for him to dissent, when he found that a majority was in favor of giving the mortgage; but I think, if he understood that the corporation was about to commit an act of bankruptcy, as he says it was, it was his duty to protest and see if the stockholders deliberately intended to put themselves in that position. He is proceeding against the corporation for an act which he helped them to commit, and this is a breach of faith towards his fellow-stockholders. There can be no clearer or more decisive act of bankruptcy than for a trader to assign all his property to trustees for the benefit of his creditors. Such an act is not even capable of explanation; because, however honest it may be, it is a technical fraud on the statute. But it has been uniformly held that a creditor who assents at a meeting of creditors, is estopped to set up the deed as an act of bankruptcy. Hicks v. Burfitt, 4 Camp. 235, note; Ex parte Kilner, Buck, 104, and the decisions of Lord Eldon, cited in that case in the argument; Bamford v. Baron, 2 Term R. 594, note; Ex parte Cawkwell, 19 Ves. 233; Back v. Gooch, Holt, N. P. 13; Oliver v. King, 8 De Gex, M. & G. 110. Two of these decisions go to the mere silence of a creditor. Indeed, in one of them the creditor advised against the course of action adopted. Applying them to this case, it would seem that the petitioner's failure to protest, at a time and place where he, as a creditor, had a right to be heard, would bind him, and this whichever way he voted on the question. My doubt was, whether at a meeting of stockholders, not called as a meeting of creditors, it might be presumed that any thing but the affairs of the corporation were to be regarded, and whether a creditor, who happened to be a stockholder, ought to be expected to interfere. But, upon reflection, I find it impossible to divide the rights and interests of the parties in this way; for every meeting of stockholders was, in fact, a meeting of the chief creditors, and, besides, it rather strengthens the argument for an estoppel, that the creditor was not only suffering the debtor to commit an act of bankruptcy, but himself held such relations to the debtor that he was bound to notify him of the consequences of his proceedings.

The evidence tends to show not merely a constructive breach of good faith, but an actual one. The petitioner left Boston before the mortgage was delivered, and left written instructions that the defendants should be made bankrupts, and the mortgage be broken up if his note was not provided for at maturity. And, on the other hand, there was no evidence that any other party interested had any thought of bankruptcy, or understood that an act of bankruptcy was about to be committed. The consent of creditors that was asked for and obtained was not to the mortgage, but to the extension; that is, Ames would extend his proportion if the others would extend theirs. As to the

mortgage, no one is estopped if this petitioner is not; because all that any of them formally and in writing agreed to was the extension. I think, upon the whole, it was the duty of the petitioner to warn the corporation that they were committing an act of bankruptcy of which he or some other creditor might take advantage; and, as he has not done so, he is estopped to set up the mortgage as such an act.

Petition dismissed.

---

MASSACHUSETTS FIRE & MARINE INS. CO. (BAYARD v.). See Case No. 1,133.

MASSACHUSETTS HOSPITAL LIFE INS. CO., Ex parte. See Case No. 9,327.

MASSACHUSETTS HOSPITAL LIFE INS. CO. (DURANT v.). See Case No. 4,188.

MASSACHUSETTS MUT. LIFE INS. CO. (CONOVER v.). See Case No. 3,121.

MASSACHUSETTS MUT. LIFE INS. CO. (DAVIS v.). See Case No. 3,642.

MASSACHUSETTS NAT. BANK (FISKE v.). See Case No. 9,857.

MASSACHUSETTS NAT. BANK (MATTHEWS v.). See Case No. 9,286.

MASSACHUSETTS NAT. BANK (MORSE v.). See Case No. 9,857.