LEIDIGH CARRIAGE CO. et al. v. STENGEL et al.

(Circuit Court of Appeals, Sixth Circuit. May 2, 1899.)

No. 697.

1. BANKRUPTCY—ACT OF 1898—TIME OF TAKING EFFECT.

In the absence of evidence to show at what hour on the 1st day of July, 1898, the president approved the bankruptcy act, it will be presumed to have taken effect from the first moment of that day; and therefore, under section 71, providing that "no petition for involuntary bankruptcy shall be filed within four months of the passage" of the act, such a petition, filed on the 1st day of November, 1898, is not premature.

2. SAME—VERIFICATION OF PETITION—WAIVER OF OBJECTIONS.

If the respondent, in a case of involuntary bankruptcy, pleads to the merits, without objecting to the form of the petition, he thereby waives any defect in the verification of the petition; such verification being a matter of form, and not affecting the jurisdiction of the court.

3. SAME—ACTS OF BANKRUPTCY—ASSIGNMENT FOR CREDITORS—SOLVENCY NO DEFENSE.

Under Bankruptcy Act 1898, § 3, providing that it shall be an act of bankruptcy if a person shall have "made a general assignment for the benefit of his creditors," such an assignment will warrant an adjudication in bankruptcy without averment or proof that the assignor was insolvent at the time of the assignment or of the filing of the petition.

4. SAME—PETITIONING CREDITORS—ESTOPPEL.

Where a debtor has made a general assignment, a creditor who goes into the state court having jurisdiction of the estate assigned, for the purpose of attacking certain alleged preferences as fraudulent, does not thereby waive his right to file a petition in involuntary bankruptcy against the assignor; nor preclude himself from attacking the same preferences in the proceedings in bankruptcy.

5. SAME.

Where a debtor makes a general assignment for the benefit of his creditors, and a creditor appears in the state court having jurisdiction to administer the estate under such assignment, for the purpose of preventing a distribution of the estate until proceedings in bankruptcy can be instituted, the time fixed by the bankruptcy act having not yet arrived, but neither assents to the assignment in advance nor ratifies it afterwards, he is not estopped to file a petition in involuntary bankruptcy against the debtor, alleging such assignment as an act of bankruptcy.

**6. SAME—TIME OF COMMISSION OF ACT OF BANKRUPTCY—RETROACTIVE CONSTRUCTION.**

A petition in involuntary bankruptcy may be maintained upon an act of bankruptcy committed before November 1, 1898, the earliest day on which such a petition, under the act, could be filed, but after July 1, 1898, the date when the law took effect. To sustain the petition in such a case is not to give the statute a retroactive operation.

**7. SAME—CONFLICT OF JURISDICTION—STATE COURT IN POSSESSION.**

Where a debtor makes a general assignment for the benefit of creditors, and the assignment is filed in the state court having jurisdiction by the state laws over estates so assigned, and the assignee has taken possession of the assets, and afterwards the assignor is adjudged bankrupt, the jurisdiction of the court of bankruptcy is paramount to that of the state court, and the assignee may be enjoined from disposing of the assets of the bankrupt in his hands, and required to hold the same subject to the orders of the court of bankruptcy.

**8. SAME—CONSTITUTIONALITY OF ACT—" UNIFORMITY. "**

Under Const. U. S. art. 1, § 8, providing that congress shall have power to "establish uniform laws on the subject of bankruptcies throughout the United States," the uniformity required is geographical, and not personal; and no limitation is imposed upon congress as to the classification of persons who are to be affected by such laws, provided only the laws shall have uniform operation throughout the United States.

**9. SAME.**

The bankruptcy act of 1898 is not lacking in the "uniformity" required by the constitution, although it discriminates, in respect to the right to file a voluntary petition, between natural and artificial persons, and, in respect to amenability to involuntary proceedings, between different classes of corporations; nor is the classification adopted by congress unreasonable, or beyond the limits of its discretion.

Appeal from the District Court of the United States for the Southern District of Ohio.

This is an appeal in bankruptcy, brought by the Leidigh Carriage Company, the adjudged bankrupt, and Henry Coleman, a preferred creditor. On the 1st day of November, 1898, Stengel and others, creditors of the Leidigh Carriage Company, a corporation under the laws of Ohio, filed a petition in the district court of the Southern district of Ohio, in which they represented that they were creditors of the defendant company in an amount aggregating more than $500, and that they had no security for the same; that the defendant was a corporation organized and doing business in and under the laws of the state of Ohio, which had its principal place of business in the Southern district of Ohio, Western division, at the city of Dayton; that the defendant was engaged in the business of making buggies; that it owed debts to the amount of more than $1,000; and that the number of all its creditors was more than 12. The petition further represented that, within four calendar months next preceding the date of the filing of this petition, the defendant committed acts of bankruptcy, within the meaning of the act of bankruptcy passed July 1, 1898, in this, to wit: First. That being insolvent on the 12th day of July, 1898, it had permitted certain creditors to obtain preferences over other creditors by the confession of judgments in favor of the former; that executions were issued upon these several judgments out of the common pleas court of Greene county, Ohio, to the sheriff of Montgomery county, Ohio, and levied upon all the goods and chattels of the said defendant, and all interest in real estate of said defendant, located and situate in the city of Dayton; that said goods, chattels, and interest in real estate had been sold, and that the defendant made no effort at any time to have such preferences vacated or discharged. Second, that the Leidigh Company, on the 13th day of July, 1898, made a general assignment of all its assets to Charles J. McKee for the benefit of its creditors. The petition prayed that the Leidigh Carriage Company might be adjudged by the court to be a bankrupt, within the purview of said act; that its estate might

be distributed as provided by said act; and that such further proceedings might be had thereon as the law in such cases prescribed.

The petition was signed in the name of the creditors by Gottschall, Crawford & Limbert, attorneys for the petitioners, and was accompanied by the following verification:

"United States of America, Southern District of Ohio.

"On this 31st day of October, 1898, before me personally appeared Levi F. Limbert, who made solemn oath that he is a member of the firm of Gottschall, Crawford & Limbert: that Gottschall, Crawford & Limbert are the attorneys of record of the petitioning creditors mentioned and described in the foregoing petition; that he has read the foregoing petition in bankruptcy subscribed by said firm as such attorneys, and knows the contents thereof; that the same is true of his own knowledge, except as to matters therein stated on information and belief, and as to those matters he believes it to be true.

"Levi F. Limbert.

"Sworn to before me by the said Levi F. Limbert, and by him signed in my presence, this 31st day of October, A. D. 1898.

"[Seal.]      Rob't C. Georgi, Deputy Clerk, U. S. District Court, S. D. O."

On the same day an application was made by the petitioners for the appointment of a receiver. In this application the plaintiffs represented that after the judgments were taken, execution issued, and the assignment made, as set forth in the petition, under an agreement between the sheriff and assignee, the assets of the Leidigh Carriage Company were sold, and there came into the hands of the assignee the sum of $55,000, as proceeds thereof, for distribution under orders of the probate court; that McKee, the assignee, has filed an application in the probate court of Montgomery county, asking and praying that said court require said judgment creditors so named in the petition herein filed to set up their respective judgment liens, and praying for an order of distribution of the funds in his hands; that such creditors have set up their judgment liens, and have asked that they be paid in full; that, if such distribution takes place, great and irreparable injury will be done to the petitioners. Wherefore the petitioners prayed for an order restraining McKee, as assignee, from paying out any of the proceeds or assets of the said insolvent now in his hands until the further order of the court, and that a receiver be appointed to take charge of the assets of the defendant company, to hold the same until a trustee in bankruptcy be elected. A temporary restraining order and injunction was accordingly issued upon the giving of a bond. Thereafter, upon the application of the defendant, McKee, the assignee, Henry Coleman, and others were made parties and given leave to answer.

The answer of the Leidigh Carriage Company is as follows:

"And now comes the defendant the Leidigh Carriage Company, and for answer to the petition and application for an injunction says: First. That said petition and application were filed on November 1, 1898, one day in advance of the date fixed by the bankrupt act. The said act was approved July 1, 1898. The petition and the application for an injunction were filed within four months, and should therefore be dismissed or stricken from the files. Second. The said petition and said application were signed and sworn to by the attorneys for the parties, when there is no provision in the act or under the rules whereby said petition or said application could be signed or sworn to by any one other than the petitioners. Third. And for a third defense denies that on the 12th day of July, 1898, the said the Leidigh Carriage Company was insolvent in the sense contemplated by said act; avers that said company, being a corporation, could not become a voluntary bankrupt, and said act was not in force for purposes of involuntary bankruptcy until November 2, 1898; and, further, that said act as to involuntary bankruptcy only takes effect, and affects preferences, from and after November 2, 1898. Fourth. An assignment having been made by said company by its deed to Charles J. McKee, at the county of Montgomery and state of Ohio, and which was filed in the probate court thereof, pursuant to law, the said plaintiffs appeared in said probate court, and in the common pleas court of said county, and there attacked the alleged preferences, consented to sales and confirmations, and prevented distribution,

and placed themselves, in respect to the property and the liens, within the jurisdiction of said state courts, and thereby deprived themselves of the right to the jurisdiction of this court in bankruptcy respecting said assets and said liens. Said proceedings are all pending in the state courts. Wherefore the Leidigh Carriage Company prays that said petition be dismissed, that the injunction be dissolved, and the application be dismissed, and all necessary relief granted to it that its facts aforesaid will warrant, together with costs.

"The Leidigh Carriage Co.,

"Per E. F. Gerber, Secy. & Treas., Respondent.

"Gunckel, Rowe & Shuey, Attorneys for the Leidigh Carriage Company."

Henry Coleman filed an answer of the same tenor.

To these answers the petitioners filed a general demurrer. The demurrers were sustained; and thereupon the court adjudged, upon the petition of the plaintiffs, that the Leidigh Carriage Company was a bankrupt within the true intent and meaning of the laws relating to bankruptcy, from which the defendant and Henry Coleman appeal.

Gunckel, Rowe & Shuey (Edward L. Rowe, of counsel), for appellants.

Gottschall, Crawford & Limbert, for appellees.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

TAFT, Circuit Judge (after stating the facts). The first objection to the action of the court below in adjudging the defendant to be a bankrupt, embodied in the first, fifth, and tenth assignments of error, is that the petition was prematurely filed. The petition was filed at 8:30 o'clock on the morning of November 1, 1898. Section 71 of the act of bankruptcy, approved July 1, 1898 (30 Stat. 544), provides as follows:

"This act shall go into full force and effect upon its passage: provided, however, that no petition for voluntary bankruptcy shall be filed within one month from the passage thereof, and no petition for involuntary bankruptcy shall be filed within four months of the passage thereof."

It is contended that under this language no petition for involuntary bankruptcy could be filed before the 2d day of November, 1898. Nothing has been introduced into the record, or otherwise brought to the attention of the court, to show at what hour of the day of July 1, 1898, the bankruptcy act was approved by the president. In the absence of such a showing, it is presumed to have been approved on the first minute of the day of July 1, 1898. Arnold v. U. S., 9 Cranch, 104; Lapeyre v. U. S., 17 Wall. 191–198; In re Welman, 20 Vt. 653; In re Howes, 21 Vt. 619; U. S. v. Norton, 97 U. S. 164; In re Richardson, 20 Fed. Cas. 699; Arrowsmith v. Hamering, 39 Ohio St. 573; Tomlinson v. Bullock, 4 Q. B. Div. 230. The case of Arnold v. U. S., supra, presented the question whether a law adding 100 per cent. to the existing duties upon imports approved upon a certain day should be applied to a cargo of dutiable goods brought within a port of entry upon that date. It was held by the supreme court that, by presumption of law, the act approved upon that day had been approved upon the first moment of that day, and therefore that the goods were subject to the duty. In the case of In re Wellman, the bankruptcy act of 1841 had been repealed by an act approved March 3, 1843. A petition in bankruptcy had been filed upon the latter

day.   The repealing act saved all pending proceedings, and the question was whether the petition was within the jurisdiction of the court. It was held by Judge Prentiss, of the United States district court of Vermont, that the repealing act took effect from the first minute of the day of March 3d, and that, therefore, the court was without jurisdiction.   This ruling was followed by the same judge in Re Howes. In Re Richardson, Mr. Justice Story considered exactly the same question, allowed the introduction of evidence to show that the act was not signed by the president until after the filing of the petition, and held that, where the evidence showed that the signing was later than the filing of the petition, effect would be given to the act only from the actual time of its passage, and the petition was sustained. This view of Mr. Justice Story's is now recognized as the law by the supreme court of the United States and by other courts.   Burgess v. Salmon, 97 U. S. 381; Louisville v. Savings Bank, 104 U. S. 469; Arrowsmith v. Hamering, 39 Ohio St. 573.

The cases in which it has been permitted to show by evidence, and by records of which the court takes judicial notice, exactly the hour and the minute of the day when a bill is passed, are cases where the effect of the ordinary presumption that the act is approved upon the first minute of the day of its approval would have been to make the legislation retroactive, and therefore harsh and unjust.   It is doubtful whether in a case like the present, where the date at issue is four months after the passage of the bill, it should be permitted to go into evidence to show the exact minute and hour of the day when the bill was approved.   We are inclined to think that in such a case, where there is no retroactive effect possible, the court should hear no evidence upon the point, but should, in order to secure certainty, hold the presumption that the act was approved on the first moment of the day of its date to be conclusive.

It is, however, not necessary for us to decide this question, because, in the absence of any proof as to the hour and minute when the bill was approved, the presumption must be given effect.   This is abundantly established by the authorities already cited.   Calculating four months, therefore, from the beginning of the day of July 1st, the four months was complete upon the ending of October 31st, and before the beginning of November 1st following.   Hence the petition of the petitioners below was filed in time.

The second objection embodied in the second and sixth assignments of error is that the petition and application were not properly verified. The petition and application were, as we have seen, signed in the names of the petitioners by the attorneys, and there was a verification showing that these attorneys were attorneys of record, and that the facts were true.   We do not propose now to pass upon the question whether this petition was verified in proper form.   The petition was answered by all the parties in interest, without any objection to its form.   We have not the slightest doubt that, under any system of pleading, such a pleading to the merits waives all formal or modal matters.   A verification of the petition is certainly a formal or modal matter, and does not reach to the jurisdiction.   This is the view which was taken by Judge Longyear in the case of In re

McNaughton, 16 Fed. Cas. 323, where a similar objection was made. and the reason of that learned judge meets our entire approval. See, also, remarks of Judge Lowell in Ex parte Jewett, 13 Fed. Cas. 580. If the case of Hunt v. Pooke, 12 Fed. Cas. 930, is to be regarded as an authority to the contrary, it suffices to say that we do not agree with it.

The third, seventh, and eighth assignments of error complain of the action of the court in adjudging the defendant to be a bankrupt in the face of the averment contained in the answer of each appellant that the defendant was not insolvent on the 12th of July, 1898, when the alleged preferences were given to the creditors named in the petition. In so far as the petition charged these preferences to be acts of bankruptcy, and sought an adjudication upon that ground, this averment certainly raised an issue of fact, which the district court must have heard and decided upon evidence before it could adjudicate the defendant to be a bankrupt. The petition, however, also alleged that on the 13th day of July, 1898, the defendant made a general assignment of its assets to Charles J. McKee for the benefit of its creditors. Such assignment is expressly declared, by the third section of the bankruptcy law, to be an act of bankruptcy, and it has been distinctly held by the supreme court of the United States in the case of Geo. M. West Co. v. Lea (decided May 22, 1899) 19 Sup. Ct. 836, that such an act justifies an adjudication of bankruptcy without averment or proof that the assignor was insolvent at the time of the assignment or of the filing of the petition. Unless the petitioners have estopped themselves from relying on this assignment as an act of bankruptcy, therefore, the answers of the defendant and Coleman did not raise any issue of fact which prevented the court from adjudging the defendant a bankrupt on the petition and answer.

The fourth and eighth assignments of error raise the question whether the following paragraph of the answer of the defendant is a sufficient defense to the petition:

"Fourth. An assignment having been made by said company by its deed to Charles J. McKee, at the county of Montgomery and state of Ohio, and which was filed in the probate court thereof, pursuant to law, the said plaintiffs appeared in said probate court, and in the common pleas court of said county, and there attacked the alleged preferences, consented to sales and confirmations, and prevented distribution, and placed themselves, in respect to the property and liens, within the jurisdiction of said state courts, and thereby deprived themselves of the right to the jurisdiction of this court in bankruptcy, respecting said assets and said liens. Said proceedings are all pending in the state courts."

This defense, in effect, is that the petitioners, by attacking the alleged preferences as fraudulent in the state courts, thereby precluded themselves from attacking these preferences in the district court by proceedings in bankruptcy. Even if the two proceedings were similar suits in law or equity upon the same cause of action, the pendency of the suit in the state court would not even support a plea in abatement in the federal court. City of North Muskegon v. Clark, 22 U. S. App. 522, 10 C. C. A. 591, and 62 Fed. 694; Gordon v. Gilfoil, 99 U. S. 168. The proceeding in involuntary bankruptcy is not primarily for the purpose of invalidating preferences, though this may be its

effect. It is merely a proceeding to sequester and distribute the assets of the alleged bankrupt equally, and, if the adjudication follows, all preferences attempted within four months of filing the petition are rendered void. The attempt in the state courts to impeach such preferences while the suit is pending cannot be construed into a waiver of the petitioner's right to invoke the aid of a court of bankruptcy for the same purpose.

The only doubtful question raised by this defense is whether enough is alleged to estop the petitioners from obtaining a judgment of bankruptcy on the ground that the defendant made a general assignment for the benefit of creditors. Conceding, without deciding, that if the petitioners assented to the deed of assignment before it was made, or ratified it by accepting its fruits thereafter, they would be estopped to set it up as a ground for adjudging the assignor to be a bankrupt, we do not think that the defense makes sufficiently clear the assent or ratification. The averment of the defense is that the petitioners appeared in the probate and common pleas courts to attack the alleged preferences, and consented therein to sales and confirmations. It may be that these sales were sales under the executions on the judgments, and not under the assignment. They had the right, as creditors of defendant, to attack the preferences as fraudulent, without admitting the validity of the assignment. The defense does not charge that they filed their claims under the assignment, or that they attempted to secure any benefit thereunder. It may be that, by doubtful inferences from general expressions in the defense, it would be possible to conclude that facts existed creating an estoppel; but estoppels cannot be inferred. They must be fully and clearly pleaded, and the facts upon which they are based must be particularly set forth. Nothing is to be supplied, by inference or intendment. Co. Litt. 227a, 352f; 4 Com. Dig. tit. "Estoppel," (E. 4); Rex v. Lyme Regis, 1 Doug. 149, 159; Meiss v. Gill, 44 Ohio St. 253, 6 N. E. 656; Brazil v. Isham, 12 N. Y. 9; Bowles v. Trapp, 139 Ind. 55, 59, 38 N. E. 406; Vanbibber v. Beirne, 6 W. Va. 168; Fredenburg v. Lyon Lake M. E. Church, 37 Mich. 476. This defense, on its face, was not intended to plead the estoppel we are discussing, and the facts alleged may be consistent with a situation in which no such estoppel would arise.

But even if the defense of estoppel had been fully pleaded, and it had been averred that the petitioners recognized the assignment by filing claims in the probate court and taking part in those proceedings, we do not think it could be sustained as a sufficient estoppel, under the circumstances of this case. The cases relied on to sustain such an estoppel are English cases, like Bamford v. Baron, 2 Term R. 594, note; Jackson v. Irvin, 2 Camp. 48; Ex parte Stray, 2 Ch. App. 374, and Ex parte Alsop, 1 De Gex, F. & J. 289, and American cases like Perry v. Langley, 19 Fed. Cas. 280; In re Williams, 29 Fed. Cas. 1327; In re Massachusetts Brick Co., 16 Fed. Cas. 1067; and In re Schuyler, 21 Fed. Cas. 760,—in which the petitioning creditor was held estopped because he had induced and abetted the committing of the act of bankruptcy he afterwards relied on in his petition, or because, after he learned of the act, he acquiesced in it, and did not at

once, when he might have done so, file a petition in bankruptcy and avoid the act. In the case at bar, when the assignment was filed in August, 1898, the petitioning creditors had no power, under the act, to file an involuntary petition avoiding it. This course was not open to them until nearly three months later. In such a situation, when the assets of their creditors were being sold and distribution upon alleged fraudulent preferences was being threatened, only one course was open to them, and that was to make themselves parties to the proceeding to prevent distribution (as the answer avers their purpose to have been) until they could invoke the aid of the bankruptcy court (the only court that could avoid the act), which they did at the earliest opportunity. This was not an election of remedies, for but one was available. It would be unjust and inequitable to regard such recognition of the deed of assignment as a conclusive estoppel against attacking it. They repudiated and avoided it as soon as the law gave them power to do so, and this is all that can be required of them. This conclusion is in accord with the views of Judge Choate upon the same general subject in Ex parte Kraft, 3 Fed. 892. For these reasons we do not think the assignments of error based on the overruling of this defense can be sustained.

It is further contended that no act of the defendant company, committed during the four months before the petition for involuntary bankruptcy could be filed under the law, can be used as a basis for such a petition, because this is to give the law a retroactive operation,—an unjust effect, which should be avoided if possible. The objection is palpably unsound. The bankruptcy law was passed on the 1st day of July, 1898. It declared on that day what should thereafter be acts of bankruptcy, and gave notice to the public that four months later petitions for involuntary bankruptcy might be filed against certain classes of persons. The acts were denounced on the 1st of July. The remedy against the injuries caused by such acts was suspended until four months thereafter. The congress, however, speaks as of the time when the law was passed, and one committing an act of bankruptcy as therein defined, after its passage, was then advised by the law that he thereby subjected himself on the 1st day of November to proceedings in involuntary bankruptcy. Creditors who sought to take a preference after the passage of the act were advised that a petition filed within four months after its passage might devest them of any interest acquired through acts of bankruptcy committed during that four months.

The ninth assignment of error is based on the fifth defense of Henry Coleman, in which he denies that there was any preference given to him by the Leidigh Carriage Company, the defendant, or that it was the result of collusion. The question as to whether the preference was void is a question which must be settled in a court of competent jurisdiction in due course. The district court has not decided the validity of the preference of Henry Coleman. It has only adjudged that the defendant is a bankrupt as of the date of the filing of the petition, November 1st. What effect that will have upon Coleman's claim to a preference is a matter for consid-

eration by the court in which the question arises, and is not here for our decision.

It is next objected in argument and the briefs, though we do not find an assignment of error specifically directed to the point, that the assets of this defendant bankrupt are in the hands of the assignee for the benefit of creditors, subject to the orders of the probate court; that the district court in bankruptcy cannot obtain jurisdiction to administer the assets which are in the course of administration, and in the possession of officers of other courts. If this objection were to be sustained, it would seriously embarrass the enforcement of the bankruptcy law, and make it subordinate to the state insolvency and assignment laws, wherever an insolvent debtor who had committed an act of bankruptcy had placed his assets in the hands of the assignee acting by state law under the direction of the probate court. It is generally true that, as between courts of concurrent jurisdiction, the court which first obtains possession of the res must retain possession of it until the res has been finally disposed of, and any one else interested in the res must apply to that court if he desires relief with respect to the property in the possession of that court. But, as between district courts sitting in bankruptcy and state courts for the administration of insolvent estates, there is no concurrent jurisdiction. The constitution of the United States, by giving to congress the power to pass uniform bankruptcy laws, gives to the courts in which congress shall vest this power paramount jurisdiction in bankruptcy proceedings. The orders in bankruptcy are therefore superior to those of a state insolvency court. Section 720, which forbids a court of the United States from enjoining proceedings in a state court, expressly excepts bankruptcy proceedings. This is the plain intimation, by federal and paramount law, that, where a federal bankruptcy court shall take jurisdiction, there the state insolvency court must yield. Hence it is that the assignee for the benefit of creditors of the defendant company, the grantee in the deed which is by the federal law an act of bankruptcy, may be made a party in the bankruptcy court, and may be required to hold the assets of the bankrupt subject to the order of the district court in bankruptcy.

The case of Blake v. Railroad Co., 3 Fed. Cas. 586, has no application whatever to the case at bar. There the question was whether a circuit court of the United States might, upon a bill in equity filed in that court, appoint a receiver to take possession of the assets of defendant railroad company which had been adjudged a bankrupt, though the assets were then in the hands of the receiver of the state court appointed in a proceeding to foreclose a mortgage. In that case the proceeding in the state court was not an insolvency proceeding; it was a proceeding to foreclose a mortgage, in the ordinary course of which possession of the mortgaged property had been taken by a court of competent jurisdiction. Bankruptcy proceedings do not stay ordinary litigation, but are taken subject to them. They do stay proceedings in insolvency or under assignments for the general distribution of the assets of the debtor.

In Davis v. Railroad Co., 7 Fed. Cas. 164, it was held by Mr. Justice Bradley, on the circuit, that a receiver in possession of mortgaged premises, under order of a state court of chancery in proceedings for foreclosure prior to commencement of proceedings in bankruptcy, could not be dispossessed by order of the district court in the bankruptcy proceedings, and in the course of his opinion the learned justice pointed out the distinction we have just made. He said:

"The rights which supervene upon a mortgage or other specific lien, accompanied with possession before proceedings in bankruptcy, are very different from those arising from proceedings in state courts in cases of general insolvency. A mere insolvent proceeding, or a proceeding of that nature, and possession of bankrupt property taken in pursuance thereof, is antagonistical and repugnant to the bankrupt law, and will be avoided by regular proceedings in bankruptcy. But a proceeding to enforce a mortgage or other specific lien involves the right of property, and possession in pursuance, legally or judicially, taken before proceedings in bankruptcy, cannot be interrupted by those proceedings."

In the case at bar the assets of the bankrupt are in the hands of the assignee for distribution by the probate court. The assignee was made a party to the proceedings below, and no reason appears why the assignee was not rightly enjoined from distributing the assets until a trustee should be elected in the bankruptcy proceedings to take custody thereof.

The last assignment of error is based on the claim that the federal act is unconstitutional. The ground for this contention is that the act is not uniform, in that a distinction is made between natural persons and artificial, and, further, that the distinction is made between classes of artificial persons. All natural persons can be adjudged voluntary or involuntary bankrupts; whereas, artificial persons, of the character of the Leidigh Carriage Company, cannot be adjudged voluntary bankrupts, but can be adjudged involuntary bankrupts, and other corporations cannot be adjudged either voluntary or involuntary bankrupts. In our judgment, the power given to congress in section 8 of article 1, "to establish uniform laws on the subject of bankruptcies throughout the United States," imposes no limitation upon congress as to the classification of persons who are to be affected by such laws, provided only the laws shall have uniform operation throughout the United States. The object which the framers of the constitution had was to enable congress to prevent the enforcement of as many different bankrupt laws as there were states. The meaning of the language of the constitution is not changed by arranging the words in a slightly different order, so that it shall read, "to establish laws on the subject of bankruptcies uniform throughout the United States." The emphasis in the phrase is on the words "uniform" and "throughout," and their correlation leaves no doubt that the uniformity required is geographical, and not personal, in the sense of being alike applicable to all members of the community.

The history of the bankrupt laws in England shows that a bankrupt law, when our constitution was adopted, which applied to all members of the community alike, would have been a great anomaly. The first bankrupt act passed in England was St. 34 & 35 Hen. VIII.

c. 4, "against such as do make bankrupt." The provisions of this act were extended and expanded by Act 13 Eliz. c. 7; by Act 21 Jac. I. c. 19; by Act 7 Geo. I. c. 31; by Act 5 Geo. II. c. 30; by Act 46 Geo. III. c. 135; by Act 6 Geo. IV. c. 16; and by Act 1 & 2 Wm. IV. c. 56. From the days of Henry VIII. to the days of Victoria the English bankruptcy acts applied only to traders, and it was not until the act of 1861 that the bankruptcy extended to nontraders. The United States bankrupt law of 1800, the first bankrupt law passed after the constitution was adopted, was an involuntary law, and applied only to traders, bankers, brokers, and underwriters. 2 Stat. 19, § 1.

The question of the classes of persons to be affected by the bankrupt law is one largely, if not wholly, within the discretion of congress. Chief Justice Marshall said in Sturges v. Crowninshield, 4 Wheat. 122, 194: "The bankrupt law is said to grow out of the exigencies of commerce, and to be applicable solely to traders; but it is not easy to say who must be excluded from, or may be included in, this description. It is, like every other part of the subject, one on which the legislature may exercise an extensive discretion." Certainly it cannot be said that, in enacting the present law, congress has passed the limits of such discretion. The proper purposes of a bankruptcy act like the present are—First (and this was its original purpose), to enable creditors to protect themselves by summary process against the frauds of their debtors in evading the payment of debts; second, to distribute the assets of the debtor equally among his creditors; and, third, to relieve debtors from the burden of debts which, through business misfortunes and otherwise, they have incurred, and which they are unable to pay. In England, until 1849, there was no provision by which petitions in voluntary bankruptcy could be filed, though there had previously been acts for the relief of insolvent debtors from an early period; and parliament had, as Mr. Justice Vaughn Williams points out in Re Painter [1895] 1 Q. B. 85, recognized that the state has an interest in the debtor being relieved from his liability, so that he shall not be weighed down by the burden of indebtedness from discharging the duties of a citizen and may employ himself in honest industry. The reason why bankruptcy legislation was limited to traders for so many centuries was because it was considered that traders were the class having the greatest opportunity, and therefore most likely, to commit the frauds which bankruptcy acts were passed to prevent.

It seems to us that the classification which congress has imposed is entirely reasonable, having regard to the proper objects for which such a law may be passed. By the present act, any person who owes debts, except a corporation, is entitled to the benefits of the act as a voluntary bankrupt. The exception finds a proper basis in the fact that it is of no particular good to the state or the public to relieve an artificial entity from a burden of indebtedness after it has failed in the purpose for which it was organized. The individuals interested in the corporation as stockholders, so far as they may be made liable for its debts, have the opportunity, should the liability render them insolvent, to apply by voluntary petition to be relieved from that

indebtedness. The corporation itself, however, is practically defunct the moment that its business stops on account of its debts, and, if the same enterprise ought to be carried on, it is better for the public and the state that a new corporation be formed for the purpose.

Any natural person may be adjudged an involuntary bankrupt except wage earners and farmers. The involuntary feature of the law is chiefly directed against frauds upon creditors. A wage earner who depends upon his salary—a salary limited to $1,500 a year— is not likely to be able to contract debts of any great amount, and is not likely to have an opportunity to commit the frauds denounced in the bankruptcy act. The same thing may be said of one in tilling the earth. The capital of the farmer is largely in the land. His crops are difficult of disposition, except at certain seasons of the year. He lives in a comparatively sparsely-settled community, in which his transactions with respect to his property are likely to be well known to his neighbors, and the opportunities for fraud are quite limited.

Any unincorporated company, and any corporation engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits, owing debts of $1,000, may be adjudged an involuntary bankrupt. So, too, may a private banker. This is merely an effort to limit the application of the involuntary feature to that class of corporations which would have come under the head of "traders" at common law. National banks and state banks are not included, because it was properly assumed by congress that the statutory provisions for winding up such corporations were usually so summary, complete, and drastic that no additional safeguards against frauds were needed. The action of the district court sitting in bankruptcy is affirmed, at the costs of the appellants.