CLARK v. HENNE & MEYER et al.

(Circuit Court of Appeals, Fifth Circuit. January 26, 1904.)

No. 1,246.

1. BANKRUPTCY—INVOLUNTARY PETITION—PLEADING ACTS OF BANKRUPTCY.

An allegation of the commission of an act of bankruptcy in a creditors' petition should state the specific fact relied on, with time, place, and circumstances, so that the alleged bankrupt may be distinctly apprised of what he is required to answer. An allegation that the defendant committed various and sundry acts of bankruptcy by paying several of his creditors various sums of money while insolvent, with intent to give preferences, without stating the names of the creditors, or the sums so paid, is wholly insufficient.

2. SAME—PROOF OF ACTS OF BANKRUPTCY—PREFERENCES.

Evidence that a debtor who was a merchant, while insolvent, and within four months prior to the filing of a petition in bankruptcy against him, made various payments of bills maturing, is insufficient to establish an act of bankruptcy, where there was no evidence that he intended thereby to give preferences or contemplated bankruptcy, nor that the creditors receiving such payments did not thereafter extend credit to him for larger amounts.

3. SAME—ESTOPPEL OF CREDITORS—INDUCING ASSIGNMENT BY DEBTOR.

Where, at a meeting of creditors of an insolvent merchant, called by him, and attended by nearly all of his creditors, a proposal was made him, by vote, and without dissent, that if he would convey his stock of goods and accounts and credits to a trustee, to be disposed of and the proceeds distributed as therein stated, they would accept the same in full of their claims, and he accepted the proposition in good faith, and made the conveyance to the trustee named by them, who disposed of the property, creditors who participated in the meeting, and were to receive their pro rata share of the proceeds of the property, are estopped to set up the conveyance by the debtor as a ground for having him adjudged an involuntary bankrupt.

Shelby, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of Texas.

T. S. Henderson, for appellant.

L. C. McBride, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. We cannot affirm the judgment of the court of bankruptcy in this case.

On December 18, 1902, Henne & Meyer, a partnership, the Eikel-Breustedt Company, a corporation, and one H. L. Witcher, filed in the bankruptcy court their petition against the appellant, asking that he be adjudged a bankrupt. This petition is not brought up in the record. On March 9, 1903, the petitioners filed an amended petition. It set forth the necessary jurisdictional facts as to the residence and occupation of the defendant, and averred that the petitioners had provable claims, amounting, in the aggregate, in excess of securities held by

¶ 1. See Bankruptcy, vol. 6, Cent. Dig. § 118.

them, to the sum of $500; stating their respective claims. The charging part of the petition is as follows:

"And your petitioners further represent that said Lee Clark is insolvent, and that, within four months next preceding the filing of the original petition herein, that the said Lee Clark committed various and sundry acts of bankruptcy, by paying to several of his creditors various sums of money, while insolvent, and that such payments are, and were meant to be, preferences. The dates and amounts of such payments, and the names of the creditors to whom they were made, cannot now be stated by petitioners, but will be fully shown upon the trial of this cause.

"And your petitioners further represent that within the said four months, and while insolvent, the said Lee Clark committed another and distinct act of bankruptcy, in that he did heretofore, to wit, on or about the 4th day of December, 1902, transfer and convey a portion of his property to a trustee, so called, to wit, one Leonard Isaacs, of Rockdale, Texas, with instructions contained in said conveyance or transfer to said Leonard Isaacs to dispose of said property for cash, and out of the proceeds to pay certain creditors of him, the said Lee Clark, in full, with intent on the part of said Lee Clark to prefer said creditors over his other creditors; said preferred creditors being, as named in said conveyance, C. M. Sessions, H. G. Murphree, T. S. Henderson, N. H. Tracey, and W. A. Morrison. And petitioners further charge that said conveyance, though in the form of a deed of trust or mortgage, and made by said Lee Clark with intent to prefer certain creditors over his other creditors, is, under the law, a general assignment, and that the making of same was an act of bankruptcy. They further charge and allege that said conveyance was made with intent on the part of said Lee Clark to hinder, delay, and defraud some of his creditors, and that such would be the effect of said conveyance if the same was executed according to its terms, and that the same is in violation of the act of Congress relating to bankruptcy, and that the making of the same by said Lee Clark was an act of bankruptcy per se."

And on the same day (March 9, 1903) the defendant filed his sworn answer, as follows:

"First. He denies that he has committed any of the acts of bankruptcy alleged against him in the petition herein filed, or that he has committed any other act or acts of bankruptcy whatsoever, and he especially denies that he has made or executed any general assignment as therein alleged, or that the instrument alleged to have been executd by him is a general assignment; and he further denies, specially, that he has transferred, while insolvent, any portion of his property to one or more of his creditors with intent to prefer such creditors over his other creditors. And he denies that the instrument alleged in said petition was such a transfer.

"Second. For further and special answer he says that heretofore, to wit, on the 4th day of December, A. D. 1902, he was engaged in business as a merchant in the city of Rockdale, in Milam county, Texas, and owned and possessed a large stock of goods, wares, and merchandise, then and there situate in his storehouse in said city, and he also owned and possessed certain notes, accounts, and other evidences of indebtedness due to him on account of his said mercantile business by a large number of persons residing in said city and vicinity, and said property was then and there of large and unknown value. He was also indebted to petitioners and to divers other persons living at Rockdale and at other places in various sums, and, desiring to retire from said business, and to liquidate, pay, and satisfy his said indebtedness aforesaid, he did then and there request and notify all of his said mercantile creditors to meet with him at said city of Rockdale on said date for the purpose of considering the matter and manner and method of payment of his said indebtedness. In pursuance of said notification as aforesaid a meeting of his creditors was duly held at said time and place, and said petitioners Henne & Meyer and Eikel-Breustedt Company, and all of his other mercantile creditors, except the petitioner H. L. Witcher, were present and participated therein. The absence of the said petitioner H. L. Witcher was overlooked and unknown to said other creditors and this defendant at said time, but the said

Witcher was then and there in said city of Rockdale, and had full knowledge of said meeting and its purpose; and at said meeting it was agreed by and between this defendant and his said creditors that defendant would execute a transfer in the form of a deed of trust or chattel mortgage, in the usual and ordinary form of such instruments, with power of sale and condition of defeasance, of his stock of goods, wares, and merchandise, notes, accounts, and other evidences of indebtedness aforesaid, to Leonard Isaacs, as trustee, to secure the payment of the indebtedness so owing by defendant, and it was agreed that the proceeds arising from said property should be applied in the following manner, viz.:

"(1) To C. M. Sessions, $259.79, said amount being due to him by defendant for clerk hire; to H. G. Murphree, the sum of $125.34, said amount being due to him by defendant as clerk hire; and to T. S. Henderson, N. H. Tracey, and W. A. Morrison, each the sum of $100, same being the amount due to them, respectively, as attorney's fees for services rendered to defendant and to his said creditors for services in the matter of said settlement and the preparation of said transfer aforesaid.

"(2) To adjust and pay the claim for rent due by defendant for the storehouse in which his said stock of goods was situated, to adjust and settle all liens on any of the goods so transferred, and to pay and adjust all claims for taxes due or· to become due thereon.

"(3) After the payment of said above items, to pay to said creditors, pro rata, the amounts due to them, respectively; and each of said creditors then and there agreeing to accept such payment, and to execute to defendant a full and complete acquittance and discharge of all further indebtedness which might be owing to them by defendant.

"(4) And any balance which might remain after the payment of said indebtedness to be paid to this defendant.

"And it was then and there agreed that upon the execution of said transfer aforesaid, and the delivery of said property to said trustee, that said creditors, and each of them, would execute to defendant a discharge from his indebtedness to them, respectively, and that the execution of said transfer and the delivery of said property to the trustee should operate as a full discharge and payment of his said indebtedness. A copy of said transfer, marked 'Exhibit A,' is hereto attached and made a part hereof, and defendant shows that the same was duly executed by him in accordance with the terms of said agreement, and said property was duly delivered by defendant to said trustee in full execution of his agreement with said creditors aforesaid, and said trustee has duly sold said stock of goods under said transfer, and now has the proceeds thereof in his hands for distribution among said creditors; and at said time it was further agreed by and among said creditors that in the event of any of the mercantile creditors of defendant who were not present and participating in said meeting, and not mentioned in said transfer, should so desire, such creditors should be permitted to share with such participating creditors in the proceeds of the sale of the property so transferred, upon the same terms as stipulated for the creditors named therein, and the value of the property so transferred by defendant was very greatly in excess of the amount due by defendant to petitioner H. L. Witcher.

"Wherefore defendant says that all of his creditors, except H. L. Witcher, by reason of said agreement, and the due and complete execution thereof by this defendant, were fully paid and satisfied, and were not thereafter and are now no longer creditors of this defendant; and particularly the said petitioners Henne & Meyer and Eikel-Breustedt Company, having so agreed with defendant, did fully discharge him from their said debts, and were not at the time of the filing of their said petition, and are not now, creditors of this defendant, and had not at said time, and have not now, a provable claim for any amount whatever against this defendant; and this defendant further shows that if any preference whatever was made, as alleged by petitioners, in said transfer, over any other creditor or creditors, that same was done by the consent and at the request and by agreement of his said creditors, and was fully concurred in by them, and particularly by the petitioners Henne & Meyer and Eikel-Breustedt Company; and he further shows that the amounts therein agreed to be paid to said Tracey, Morrison, and Henderson as aforesaid were not, in fact, preferences, as alleged, but, as aforesaid, were

duly agreed to be paid by said creditors, and, further, said amounts were then and there due to said parties, who were practicing attorneys at law, for professional services rendered and to be rendered by them to said creditors and defendant and said trustee, at their request, in the matter of preparing said transfer aforesaid, and were in fact expenses necessary and incident to the transfer and disposition of said property in accordance with said agreement, and the amounts therein directed to be paid to said Sessions and Murphree were then and there agreed to be so paid by said creditors aforesaid; and defendant further shows that the same were not preferences, as alleged in said petition, but were for an amount then and there due and owing by defendant for services rendered by them within three months next before said date, and were then and there, in law, preferred claims against said property.

"Wherefore, by reason of the premises, defendant says that he has fully paid and satisfied said petitioners Henne & Meyer and Eikel-Breustedt Company all indebtedness due by him to them, or either of them, and particularly the indebtedness described in their petition herein filed, and he was not indebted to them, or either of them, on the date of the filing of their said petition against him, and is not now justly indebted to them, or either of them, in any sum whatsoever, and neither of said petitioners has a provable claim against him in any sum whatsoever, nor had when said petition was filed, and neither of said petitioners is a creditors [creditor] of this defendant, nor was when said petition was filed. Defendant was indebted to said H. L. Witcher at the time said petition was filed, and is now indebted to him, in said sum of $50 only, and said Witcher at the time of the filing of said petition and at this time has a provable claim against him for the amount of $50 only, and was and is now a creditor for said amount only; and no other person has a provable claim against the defendant for any amount whatever, save and except the said H. L. Witcher for the sum of $50, and said claim is not sufficient in amount to entitle said Witcher to have and maintain his petition herein filed against this defendant. Wherefore he prays that said petition be dismissed, with all costs and attorney's fees, and he further prays that he have a trial by jury herein."

And on the same day, after hearing testimony, the court thereupon adjudged as follows:

"On this day this cause coming on to be heard in said court, upon the petition of Henne & Meyer, Eikel-Breustedt Company, and H. L. Witcher, praying that Lee Clark be adjudged a bankrupt, within the true intent and meaning of the acts of Congress relating to bankruptcy, and the said Lee Clark having denied the acts of bankruptcy alleged to have been by him committed, and the parties having waived a jury in writing, and submitted the issues joined to the court, the court thereupon, and upon consideration of the proofs in said cause, found that said Lee Clark, while insolvent, and within four months next preceding the filing of the petition in bankruptcy in this cause, transferred a portion of his property to several of his creditors with intent to prefer such creditors over his other creditors. Now, therefore, it is adjudged that said Lee Clark be, and he is hereby, declared and adjudged a bankrupt; and the clerk will enter an order accordingly, conforming as near as may be to form No. 12."

Three witnesses were called for the petitioning creditors, namely, the defendant, Lee Clark; the petitioner H. C. Meyer, a member of the firm of Henne & Meyer; and E. B. Phillips, an employé of Henne & Meyer. Without distinguishing between the direct and the cross examinations, or following rigidly the form of question and answer in which the testimony appears in the transcript, we give the testimony of these witnesses with considerable detail. Mr. Clark says:

"I am the defendant. Rockdale has been my home about ten years. I have been in business there as a merchant, having commenced that business about nine years ago. I quit it about the 4th of December [1902]. The deed of trust which I made to Mr. Isaacs on that day states the facts as to my indebtedness.

The exact amount I cannot now remember—something like eighteen or twenty thousand dollars. The property that I owned at that time invoiced over seven thousand dollars, besides the notes and accounts, which notes and accounts were worth, I think, something over five thousand dollars. What I owned at that time was not sufficient to pay my debts. I suppose I was insolvent when I made the deed of trust. Q. Did you make any payments to any creditors during the four months preceding the execution of this document? A. I did; but I don't remember what they were. I made some payments on what I owed. Q. Did you pay Scarborough & Hicks during that four months? A. No, sir; not that I know of. Q. Can you recall anybody you paid money to during the four months? A. Yes; I remember several. Q. Name some of them. A. I cannot remember the amounts. I paid Parlin & Orendorff, of Dallas. Q. How much? A. I think about $200. Q. Who else? A. I paid Mr. Witcher $150. Q. Who else? A. I paid— I cannot remember exactly whether it was within the four months I am speaking of. I paid Tom Padgitt. Q. How much did you pay him? A. I don't remember whether it was $150. I think about that. I paid Eikel-Breustedt. Q. Did you pay all of your creditors, then, during the four months? A. No, sir. Q. Well, those you paid had no better claim against you, did they—any more preferred claim—than the others you did not pay? A. I only paid as they became due and they drew on me for it. I was carrying on my mercantile business at the time these payments were made, and they were made in due course of business to my creditors. Q. by Counsel for Defendant: In regard to this instrument here—the deed of trust—state in regard to that, how it came about? A. Well, when I realized the situation, I sat down and wrote to a number of my creditors—the largest of them—and told them I wanted to call a meeting on the 4th of December, I believe it was, to consult them. I did not want to do anything until I had consulted and advised with them as to what was best in the premises. I did not want to go to any expense and costs until they recommended what I ought to do. And the meeting was held there, and, as well as I remember, something over 95 per cent. of my creditors were present, and at that meeting they made a proposition to me. When I got into the meeting the meeting had already opened, and they had taken a list of about how much I owed among them, and they asked me, if I remember correctly, and I handed them a statement, and told them; and they suggested that I make a deed of trust. I told them I would let them know as soon as my lawyers came. Mr. Henderson did not come in on the train, and I was waiting to see him, to let them know what to do. I left the meeting, and while I was gone to see Mr. Henderson they made an agreement among themselves; and when I went back they reported to me that if I would make a deed of trust conveying my stock of goods and notes and accounts, and appoint Mr. Leonard Isaacs as trustee, they would accept it and relieve me of my indebtedness. I complied with their request and made a deed of trust, and it was agreed that the attorneys should be paid the amounts stipulated, and if I made this deed of trust and appointed this trustee—and they suggested this—they would relieve me from my liabilities. The attorney's fees, it was agreed, should be paid as preferred claims, and the clerk hire and the rent. All as mentioned in the instrument was agreed to. I executed the deed of trust, and delivered it to the trustee, and turned over the property described in it to the trustee, who has had possession of it ever since. Mr. Meyer was at the meeting, and represented Eikel-Breustedt. Why Mr. Witcher was not present, I do not know. I do not know that he was personally notified; but it was generally understood, and his was a small claim, and he was included in a number of parties I owed, in the deed of trust; but I do not know just why he was not there, and I do not know just why he was not notified. There was no secrecy or privacy about the meeting. It was generally understood, and everybody was notified, because I had it attended to. The creditors organized the meeting and elected their officers. They elected Mr. Coffield, Mr. Witcher's partner, president of the meeting. [Mr. Witcher's claim was not a firm obligation. It was an individual debt.] Mr. Peter, of Dallas, was secretary. There were minutes of the meeting kept, but I do not know where they are. Mr. Meyer did not withdraw from the meeting, and say he would have nothing to do with it, a few days before the document was made. Q. Didn't he give you notice that he would have nothing to do with it—would repudiate the whole thing—take his own course, and declined

to participate in the meeting? A. After the meeting was over, Mr. Meyer sent Mr. Phillips. I suppose he sent him. Anyhow, he tried to get me to secure them on the side for the indebtedness to them, and I told them that I had not done that to anybody, and couldn't prefer anybody. Q. Did not he expressly, declare his repudiation of the whole thing? A. Yes; he said if I did not protect him he would have nothing to do with it. He said that after the trustee was appointed, not before the trustee was appointed. I think not before the meeting was adjourned. Q. Did Mr. Meyer represent Eikel-Breustedt Company? A. He said he had authority to represent them. Q. Did not he say he would have nothing to do with it? A. Mr. Meyer did not say anything to me at all. After this deed of trust was made, and the meeting was over, Mr. Phillips said that— Q. Did not Mr. Meyer go to you before the deed of trust was made, and say he would have nothing to do with it? A. No, sir; after the deed of trust was made. Q. You did not have any conference with Mr. Meyer at all until after the deed of trust was made? A. No, sir; except that we figured on his buying the stock of goods. That was all. Q. Mr. Clark, how long have you been insolvent—that is, owed more debts than you could pay? For a year or two? A. I could not say. Q. More than a year? A. I think not. Q. Could you, with the property you owned, have paid your debts? Could you have sold your stuff for enough to have paid it dollar for dollar, and cleared yourself of indebtedness? A. I do not know whether I could have or not. I had enough stuff if I could have sold it at a reasonable value. Q. How long before that were you insolvent? A. I could not say. Q. Six months? A. I don't know. I did not realize I was going to fail before thirty days before I did fail. Q. Did you owe over six months ago more than your property could have paid out, if sold at a reasonable value? A. I don't think so. I could not say."

### H. C. Meyer, a witness called by the plaintiffs, testified:

"I am one of the partners of Henne & Meyer, and live in Rockdale. My firm is a creditor of Lee Clark. I represented my firm, and also Eikel-Breustedt Company, at the creditors' meeting preceding the execution of the deed of trust. I appeared in the meeting, not thinking it was binding in any way. In reference to his conveyance of property, my understanding was that he was to convey all of his property. Q. by Mr. Henderson: Did you participate in the meeting up to its close? A. Yes, sir. Q. What was said between you and Mr. Clark about securing you on the outside—about your not consenting to the proceedings? A. There was not anything said then. That was said before. I don't know as I spoke to Mr. Clark any more after the meeting, but I did speak to his attorney. Q. You say you spoke to him before the meeting. What was that? A. It was before the meeting that I wanted security, not after the meeting. Q. Then after the meeting did you go to any of his attorneys and have a conference? A. Yes, sir; I went to Mr. Morrison, and told him I would not take part, and I told him I would not sign the instrument. Q. You went to Mr. Morrison before the document was executed, and said you would have nothing to do with it? A. Yes; he had just commenced on the instrument, and said it was no use to commence it then, if I would not agree to it. Q. In that, were you acting for your partner and Eikel-Breustedt Company? A. In that, I only acted for myself. I could not act for Eikel-Breustedt Company, as I had not authority, except to put in their claim. Q. Did you agree to cancel your debt if he gave you a mortgage on this property? A. No, sir. Q. by Mr. Henderson: What did you agree to do, Mr. Meyer? A. I did not agree to do anything there. Q. At the creditors' meeting? A. No, sir. Q. You remained there until they got through? A. Yes; I remained silent. Q. After they adjourned, you left with the crowd? A. Yes; and it was possibly an hour before I went to Mr. Morrison, who was then drawing the instrument. Q. The fact about it is, it was in the evening when you went to Mr. Morrison, was not it? A. I am not sure about it. I remember he had just commenced writing the instrument, and possibly ten lines had been written. Q. The creditors' meeting was held up in the hall in the forenoon? A. Yes, sir. Q. Had a little judge's stand there, did they, for the chairman and secretary? A. Yes, sir. Q. The proceedings were open and public there? A. Yes, sir. Q. You came, and made

no objection? A. No, sir. Q. The creditors voted when the questions were put? A. Yes. Q. And you did not notify the meeting you would not agree to what was done? A. No, sir. Q. You represented your claim and Eikel-Breustedt's claim? A. Yes, sir. Q. And you stated to the meeting that you did represent them? A. Yes, sir. Q. And you were present when all the proceedings were had? A. Yes, sir. Q. Did Mr. Clark pay you any money during the fall? A. No, sir; he did not pay us any money, but he paid us a note. Q. Of what amount? A. Well, I don't remember. I think, $60—in the neighborhood of $60. Q. by the Court: What month was it? A. I think it was in November. I am not sure about it. Either October or November. I think, in November. Q. by the Court: A month before this? A. Yes, sir. Q. You wanted to buy the stock of goods, did not you? A. Yes, sir. Q. You and the trustee could not agree on the price? A. No, sir. Q. And you dickered along until the 18th of December trying to buy the stock of goods? A. Yes, sir. Q. Failing to buy it, you then filed a petition in bankruptcy? A. Yes, sir. Q. After you filed the petition, you bought the stock of goods, didn't you? A. Yes, sir; under the condition that the proceedings in bankruptcy would be dismissed. Q. And after you did that you decided you had agreed to pay a little too much for it, didn't you? A. Yes, sir; the goods were to be delivered before Christmas, when they were worth more money than if sold after Christmas. Q. The trustee had to come down from about $4,200 to $3,600, didn't he? A. Yes, sir. Q. Didn't you claim that, the Christmas season being about over, you did not care for the stock of goods? A. I wanted them before Christmas. That is correct. I didn't want them after the Christmas season. Q. Yours and this stock were the only stocks of Christmas hardware in the city, weren't they? A. I didn't have any Christmas hardware; no, sir. Q. You had some nice household articles, didn't you? A. No, sir. Q. You did not dismiss the proceedings, did you? A. No; I tried to do so. Q. What did you do toward dismissing the proceedings? A. I asked our attorney to have it dismissed—phoned him the same day, directly after the deal. I phoned him to have the case dismissed. Q. Did not you tell Mr. Isaacs after Christmas that they were not worth what you had agreed to pay? A. Not after Christmas. I don't know when, but I told him before Christmas that I didn't want the goods after Christmas. Q. They had been all tied up during the Christmas season? A. Yes; I remember I told him now that they were worth it now, but would not be worth it after the Christmas holidays. Q. Did not Mr. Isaacs go to you and tell you you could have them before Christmas? And didn't he tender you the keys of the house? A. Yes, sir. Q. Told you to take the goods? A. Yes, sir. Q. Isaacs was solvent? A. Yes, sir. Q. You would not have any fear hereafter about any proceedings of his? A. No; but I was not posted in the bankruptcy business. Q. Did not you buy the goods, and succeed in keeping them off the market during the Christmas holidays? A. No. Q. Didn't your firm extend to Lee Clark credit exceeding $60 during the four months? A. Yes, sir. Q. Was any creditor joining and refusing to dismiss it [the bankruptcy proceeding]? A. The bank was. I asked to have the case dismissed. Mr. McBride, I suppose it was, phoned to the court, or phoned you, to have it dismissed. I mentioned the case to Mr. Witcher, and he told us—I think, in the presence of Mr. Morrison —that he 'would be in hell before he would see it dismissed.' Of course, we then dropped the matter. I think those are the very words Mr. Witcher used. Q. Witcher is one of the petitioning creditors? A. Yes, sir. Q. Is Mr. Witcher here now? A. No, sir; I don't think he is. Q. He is the only person who ever objected to the dismissal? A. That is all I know of."

E. B. Phillips, a witness called by the plaintiffs, testified that he worked for Henne & Meyer. Lived in Rockdale. Recollects being sent by Mr. Meyer, on the 4th of December, to Mr. Clark, with a message.

"He told me to go up and notify Mr. Clark that he had decided he would not sign this agreement that the lawyers at this time were writing out. He said that he was going to see Mr. Morrison himself, and sent me to see Mr. Clark. I saw Mr. Clark, and delivered the message. I think it was just be-

fore I went to dinner, or just after I came back. I am not positive which, but it was very soon after the adjournment of the creditors' meeting. Q. by Mr. Henderson: Is it not a fact that Mr. Meyer was not required to sign this instrument at all? A. He thought it was required to be signed by him. Q. There was another instrument that he was required to sign, between him and Mr. Isaacs? A. Yes, sir. Q. Did you have two conversations with Mr. Clark? A. I did not have any with Mr. Clark about buying the stock of goods, at all. Q. In the conversation that you did have with Mr. Clark, in which you told him what Mr. Meyer said, did not you say to him that Mr. Meyer would stand by that, unless he would give him something on the side? A. Yes. Q. And what did Mr. Clark tell you about that? A. Mr. Clark replied that he would not do it; that he had not done anything of the kind, and, so far as going into bankruptcy was concerned, he thought that was the best thing that could happen to him, anyway, and the only reason he regretted it was, he thought the creditors would be delayed in getting their money; that ultimately he would have to take the bankrupt law, anyway, and it did not make any material difference to him. Q. Didn't he also state that he had stayed out of bankruptcy in order to protect, as far as he could, the interests—the estate—of his creditors, in order that they would get what they were going to get as quickly as possible? A. Yes; that they would get it quicker than by going into the bankruptcy court—by making this deed of trust and not going into bankruptcy at all at that time."

The court permitted the minutes of the creditors' meeting to be read in evidence, substantially, as follows:

"Rockdale, Tex., 12/4, 1902. Creditors' meeting of Lee Clark, met and organized by electing C. H. Coffield prest. and W. P. Peter secty.; fifteen creditors were present in person and proxy, representing $20,074.00, and outside there was estimated to two creditors whose claim represents $800, to which be added taxes to be paid, and rents on unexpired lease for the current year about $880.00, and salaries and expenses. Creditors appointed Leonard Isaacs on suggestion of Lee Clark. Motion put and carried, Hicks and Coffield appointed to act with Leonard Isaacs. Motion put and carried to accept the notes, accounts and stock and release Mr. Clark from all obligations.

"[Signed]            C. H. Coffield, Prest.
"W. P. Peter, Secty."

The other witnesses examined were Leonard Isaacs (the trustee), R. H. Hicks, W. A. Morrison, and N. H. Tracey, all of whom, with substantial unanimity, testified to the fact that the instrument conveyed the property which the creditors agreed in the creditors' meeting should be conveyed, and directed the distribution of the proceeds in accordance with the views held and clearly expressed in the hearing of all of the creditors engaged in the meeting, and not objected to or dissented from by any of those present; that the property was surrendered at once to the trustee, whose right and duty to hold and care for and dispose of the same has not been questioned by any of the creditors, other than the petitioning creditors; that the goods have been subject to some inconsiderable loss, and that the stock of goods has been sold at something less than 50 per cent. of the invoice value; and that he now holds the proceeds deposited in a local bank for distribution under the deed of trust, or subject to the orders of the court herein.

It is manifest that the petition of the plaintiffs charges only one distinct act of bankruptcy, namely, the conveyance made December 4, 1902. Form No. 3, after the allegations required to show the jurisdiction of the court, is in these words:

"And your petitioners further represent that said ———— is insolvent, and that within four months next preceding the date of this petition, the said ————

committed an act of bankruptcy in that he did, heretofore, to wit, on the —— day of ——," etc.

This is substantially followed in charging the execution of the deed of trust, but is not substantially met by the charge that—

"Lee Clark is insolvent, and that, within four months next preceding the filing of the original petition herein, the said Lee Clark committed various and sundry acts of bankruptcy, by paying to several of his creditors various sums of money while insolvent, and that such payments are and were meant to be preferences. The dates and amounts of such payments, and the names of the creditors to whom they were made, cannot now be stated by petitioners, but will be fully shown upon the trial of this cause."

And this paragraph in the petition is not taken from the original petition, but from the amended petition, which was filed the same day that the proof was heard and the order of adjudication passed. "A petition in involuntary bankruptcy is in the nature of a pleading, and should set forth all the facts material to the claim of the petitioners for an adjudication, so that the alleged bankrupt may be distinctly apprised of what he is required to answer." Brandenberg on Bankruptcy, p. 288, § 10, citing In re Raynor, 7 Nat. Bankr. R. 527, 11 Blatchf. 43, Fed. Cas. No. 11,597; In re Randall, 3 Nat. Bankr. R. 4, Deady, 557, Fed. Cas. No. 11,551; In re Chappel, 4 Nat. Bankr. R. 176, Fed. Cas. No. 2,612.

In Re Nelson, 98 Fed. 76, Judge Bunn, in the District Court for the Western District of Wisconsin, held that:

"The allegation that Nelson had, within four months last past, transferred, while insolvent, large amounts and values of his property to one or more of his creditors, with an intent to prefer said creditors over his other creditors, is quite insufficient as an allegation of fact. The specific fact relied upon should be alleged, with time, place, and circumstance, as in any other allegation of fraud in a pleading either in law or equity."

He cites numerous authorities. Without referring to them, we concur in his announcement of the rule. But if this were not so, and the proofs offered and heard were admissible under the pleading, it is manifestly most insufficient to support the charge. It not only does not tend to show a disposition to prefer one creditor over another, but, with remarkable energy, does show the utmost anxiety to treat all alike. It does not show that each of the payments made within the four months before the filing of the petition was not made in the regular course of business, and followed by credit of equal or greater amount extended by the creditor to whom such payment was made, in the shape of goods that went into his business, and increased, rather than diminished, the assets of the bankrupt. It is expressly shown by the testimony of the most active of the petitioning creditors—the only one who was examined on the stand—that one payment, the only one the date of which is distinctly fixed within the four months before the filing of the original petition, was made to him, not in money, but in a note, and that after this his firm did extend credit exceeding $60 to the defendant. It is shown by the testimony of the defendant that he paid Parlin & Orendorff, of Dallas, about $200, but it is not shown that they did not extend to him further credit. It is shown by his own testimony

that he paid to Witcher about $150. He testifies to some other small payments, but expressly says he cannot remember exactly whether it was within the four months, and no other proof on the subject was offered. We think it is clear that the petitioning creditors must rely upon the distinct act of bankruptcy which they charge, namely, the execution of the deed of trust; and it seems equally clear to us that the petitioners Henne & Meyer and Eikel-Breustedt Company should not be permitted to obtain against the defendant an adjudication of bankruptcy based on that charge. We refrain from reviewing the authorities, because we find it to have been so well done by the Circuit Court of Appeals for the Sixth Circuit in the cases of Simonson v. Sinsheimer et al., 95 Fed. R. 948, 37 C. C. A. 337, and Carriage Co. v. Stengel, 95 Fed. 637, 37 C. C. A. 210. After a review of numerous cases, the opinion in the Sinsheimer Case uses this language:

"Judge Lowell, in Re Romanow [(D. C.) 92 Fed. 510] followed Perry v. Langley [19 Fed. Cas. 280], and holds that an assignment consented to and participated in by the petitioning creditor estops him from relying upon that as a ground for seeking to have the assignor adjudged a bankrupt. After an examination of the foregoing cases and the statutes under which they were decided, we are unable to concur with Judge Allen in his conclusion that a petitioning creditor may not be estopped to set up an assignment for the benefit of creditors as a ground for adjudging the assignor a bankrupt. Could one who had induced and abetted another to convey to him property in fraud of his creditors file a petition against his fraudulent grantor, basing his petition on the fraudulent conveyance? It seems to us clear that he ought not to be permitted thus to take advantage of his own wrong. To hold otherwise would enable the unscrupulous to entrap a person into involuntary bankruptcy. This has been the view of the courts under all previous bankrupt laws, and any person conniving in the alleged act of bankruptcy, whether it be actually fraudulent, or only constructively so, has always been denied relief asked on the ground of such act. Are the provisions of the present law so different from the earlier laws of this country and the English law as to justify a different holding? The present law declares the assignment for the benefit of creditors to be an act of bankruptcy, but this is only what was uniformly held to be the effect of the act of 1867 and of the English bankrupt laws." [Citing authorities.]

And again, later in the opinion, this language occurs:

"While the doctrine may have originally rested wholly on estoppel, it would be difficult now to explain thus all the cases of election. We think the only just ground for refusing to allow a man to complain of an act of bankruptcy is that he induced the act, or after its commission he so acted with regard to it that he gave others the right to act on the faith of its validity so far as his subsequent conduct would affect it. On the one hand, it would be gross iniquity to allow him to subject the debtor to judgment for an act he induced; and, on the other, it would be equally unjust to allow him to repudiate, as invalid, a transaction, when by his conduct he had induced others to change their position on the faith of its validity."

We think the case before us satisfies all the conditions suggested in the opinion from which these excerpts are taken. If creditors could, by previous acts and by contemporaneous acts and by subsequent acts, estop themselves from setting up the assignment involved in this case as a ground to support an adjudication of bankruptcy against the defendant, then the petitioning creditors Henne & Meyer and Eikel-Breustedt Company must be held to have done so in this case. So far as this record shows, there is in existence only one other creditor, the

petitioner H. L. Witcher, against the defendant's estate, and that is for the sum of $50 only.

The judgment of the court in bankruptcy is reversed, with directions to that court to dismiss the petition at the cost of the petitioners.

SHELBY, Circuit Judge, dissents.