TEXARKANA & FT. S. RY. CO. v. CASEY.
(No. 1361.)

(Court of Civil Appeals of Texas. Texarkana. Dec. 16, 1914. Rehearing Denied Jan. 7, 1915.)

1. MASTER AND SERVANT (§ 136*)—INJURIES TO SERVANT—KNOWLEDGE OF DANGER.

Where those in charge of switching operations had cause to know that a car inspector was between the cars, it was negligence for them to move the cars, although he did not set the warning lights required by the rules.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 272; Dec. Dig. § 136.*]

2. MASTER AND SERVANT (§ 276*)—INJURIES TO SERVANT — ACTIONS — EVIDENCE — SUFFICIENCY.

Evidence *held* to warrant a finding that the death of plaintiff's intestate resulted from negligence of other servants of the railway company.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 959, 970, 976; Dec. Dig. § 276.*]

3. MASTER AND SERVANT (§ 289*)—INJURIES TO SERVANT — EVIDENCE — QUESTION FOR JURY.

The question of a deceased servant's contributory negligence *held*, under the evidence, for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089, 1090, 1092–1132; Dec. Dig. § 289.*]

4. MASTER AND SERVANT (§ 213*)—INJURIES TO SERVANT—ASSUMPTION OF RISK.

Where a car inspector went between cars which he thought had been coupled and would not be moved, without setting the warning lights required by the master's rules, and it was the custom of switchmen to give notice before moving the cars or to refrain from moving them where they knew inspectors were liable to be between them, there is no room for the operation of the doctrine of assumption of risk; the inspector having no reason to assume that the switchmen would be negligent.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 559–564; Dec. Dig. § 213.*]

5. APPEAL AND ERROR (§ 544*) — RECORD — QUESTIONS PRESENTED FOR REVIEW.

Written interrogatories calling for findings of fact by the jury constitute no part of the charge, and unless preserved by an appropriate

bill of exceptions in accord with Rev. St. 1911, art. 2058, the denial of requested interrogatories cannot be reviewed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2412–2415, 2417–2420, 2422–2426, 2428, 2478, 2479; Dec. Dig. § 544.*]

6. TRIAL (§ 250*)—INSTRUCTIONS—ERRORS.

Where the instructions were not incorrect or misleading, the fact that they included matters not necessary to enable the jury to decide the case is no ground for complaint.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 584–586; Dec. Dig. § 250.*]

7. APPEAL AND ERROR (§ 231*) — REVIEW — PRESENTATION OF GROUNDS.

Objection that a charge is on the weight of the evidence is too general, where it was not pointed out what particular part of the charge invaded the province of the jury.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1299, 1352; Dec. Dig. § 231.*]

8. TRIAL (§ 234*)—INSTRUCTIONS—ERROR.

Where the case was submitted to the jury on special interrogatories, the giving of instructions which informed the jury what facts had to be found to entitle plaintiff to recover is not error, for it cannot be assumed that the jury out of sympathy for the plaintiff, who was suing a railroad company, would find, without regard to the evidence, merely to enable plaintiff to recover.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 534–538, 566; Dec. Dig. § 234.*]

9. LIMITATION OF ACTIONS (§ 127*)—AMENDMENTS—EFFECT.

Where, within the period of limitations, plaintiff sued as widow and parent of surviving children, the filing of an amended petition, wherein she sued as administratrix so as to bring her cause of action within the federal Employers' Liability Act April 22, 1908. c. 149, 35 Stat. 65 (U. S. Comp. St. 1913, §§ 8657–8665), is not the institution of a new suit, and limitations are tolled by the filing of the original petition.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 543–547; Dec. Dig. § 127.*]

Appeal from District Court, Bowie County; H. F. O'Neal, Judge.

Action by Mrs. Lillie B. Casey, as administratrix, against the Texarkana & Ft. Smith Railway Company. From a judgment for plaintiff, defendant appeals. Affirmed.

See, also, 151 S. W. 856.

Glass, Estes, King & Burford, of Texarkana, for appellant. Smelser & Vaughan and Graham & Smitha, all of Texarkana, and Johnson & Edwards, of Tyler, for appellee.

HODGES, J. The appellee, Mrs. Lillie B. Casey, administratrix of the estate of her husband, Ben F. Casey, instituted this suit against the appellant railway company to recover damages for injuries resulting in his death. This appeal is from a judgment against the railway company for $16,000. Many of the facts concerning the conditions under which the injury was inflicted are undisputed and will be briefly stated.

At the time of the accident in December, 1909, Ben F. Casey was employed in the service of the appellant as head car inspector in its yards at Texarkana, Tex. Some time during the early morning hours of December 23, 1909, while undertaking to couple the air-hose between some coal cars, Casey was run over and fatally injured, his legs and one arm were crushed, and he died a short time thereafter. What is referred to in the evidence as "freight train No. 74" was a through train due to arrive in Texarkana from the South in the early part of the night, but on this occasion it did not arrive till 5:30 in the morning. It was expected to go on north after being inspected and taking on additional cars. The appellant's track in Texarkana runs north and south, and there are a number of switch tracks which parallel the main line. When freight train No. 74 arrived, it went in on switch track No. 1, which is next to and east of the main line. This train consisted of about 48 cars, and practically filled track No. 1. It was then the duty of Casey and his assistant, Joe Wilson, to inspect this train of cars. They placed a blue light on the rear end of the train and began their work of inspection, going north towards the front end. The switching crew, consisting of Iiams as foreman, Bentley and Sturtevant, waited at the north end of No. 74 for the inspectors to complete their work. The crew had with them a switch engine which they expected to use in doing the necessary switching. In the course of the inspection Casey and Wilson found two bad order cars, which we infer from the evidence were Nos. 15 and 16 from the front end of the train. There is some difference in the testimony of the witnesses as to just what was said between Iiams and Casey when the inspection was finished. Wilson, who appears to have been near them at that time, testified that while they were inspecting train No. 74 he heard some one whom he took to be Iiams say something about 12 coal cars; that when they finished their inspection Casey said, "All right," to the switching crew, meaning that the inspection of that train was completed. Bentley, one of the switchmen, says he was about a car length from Iiams, and heard him say to Casey:

"He gets those 12 coal cars on long house, and I am going to leave his head end in and let him do his own doubling over."

He further stated that Casey made some remark and then walked away. What is here referred to as "long house" was a switch track on the west side of the main line and which connected with the main line a short distance north of the point of the junction of the main line and track No. 1. There were 12 coal cars standing on this "long house" track, which were to be incorporated into train 74 before it went north. It is conceded that the meaning intended to be conveyed by the language used by Iiams to Casey was that the conductor of No. 74 was to take those 12 coal cars into his train; that the switching crew would shove the 14 cars, after elim-

---

inating those in bad order, in on "long house" track, couple them to the coal cars, and leave them there; and that the train crew would connect them with the other portion of train 74 which had been left on track No. 1. As to what occurred between him and Casey, Iiams testified as follows:

"I told him there were 12 cars to pull out on the long house track, and we would throw 2 bad orders out of the train and shove the other 14 on the long house, and 74 could double from the long house onto track No. 1. When those 2 bad orders were kicked down the main line, that left the switch engine with 14 cars. Those 14 cars were to go north. I told Mr. Casey that I would put them in on the long house track. He understood we would couple those cars onto the 14 cars. What I meant by saying engine 74 was to double was when 74 pulled in they had a track full of cars; those cars were all to go, with the exception of the 2 bad orders. Of course, we had those 12 on the long house track to go with them."

After the conversation referred to, the switching crew disconnected the 16 cars at the front end of train 74, including the 2 in bad order, pulled up on the main line, then shoved the two bad order cars down on the main line below the switch connection, leaving them there. They then pulled the remaining cars north and shoved them in against the coal cars on "long house" track. The automatic couplers failed to work, and the coal cars rolled down the track about a car length or more, according to the testimony of Wilson, and then stopped. In just a few seconds another impact occurred and the coupling was effected, and all of the cars were pushed down on "long house" track so that the main line would be clear. It appears that, when Casey left Iiams after their conversation above referred to, he went immediately over to the 12 coal cars and began inspecting them and coupling the air-hose between the cars. When the second impact occurred, he was between the first and second coal cars from the south end, and was in the act of coupling the air-hose. It was then that he received the injuries that resulted in his death. The wheels of the car north of him passed over and crushed his legs and one arm. Shortly after the accident Casey stated to those who came to his assistance that he "thought the boys were through," and that he was coupling the air-hose.

The petition charged negligence on the part of the switching crew in failing to notify Casey before making the second attempt to couple onto the string of coal cars.

The 'court submitted the case on special issues. In responding to the questions propounded the jury found, in substance, that when the collision occurred which caused the accident both Iiams and Sturtevant knew, and had reason to believe, that Casey was between the cars, in the performance of his duty; that, if they did not know it, they might have known it by the exercise of ordinary care; that the members of the switching crew were guilty of negligence in failing to notify Casey that they were intending to make a second attempt to couple onto the coal cars; that Casey was not guilty of contributory negligence in going between the cars at the time and under the circumstances then existing. Upon the findings of the jury, which include many not here noted, judgment was rendered in favor of the plaintiff below for $16,000.

[1-3] The question of first importance is: Does the evidence support a finding of negligence in the manner alleged? In the fifteenth assignment of error, where this question is raised, the appellant thus states the particular grounds upon which it relies:

"The undisputed evidence showed that a short time prior to the accident deceased, Casey, was informed of the exact manner in which the work of breaking up train 74, setting out the two bad order cars, setting the coal cars into the train, etc. (would be done); that the work was done in the exact manner in which the said Casey was informed it would be done; that only a few seconds before the accident occurred the switching crew actually shoved a cut of cars against the coal cars, moving the latter a few feet; and that between the time the cars came together the first time and the second time the said Casey, without the knowledge of any member of the switching crew, went in between two of said coal cars 25 or 26 cars from the engine, and 10 or 12 cars away from any member of the crew, thereby receiving injuries causing his death. Defendant shows that plaintiff wholly failed to show that defendant was guilty of the negligence alleged, but, on the contrary, that said evidence shows that the said Casey, in going between said cars at the time and place and under the circumstances he did, assumed the risk as a matter of law."

Other assignments attack specific findings by the jury upon which they must have based their conclusion in regard to negligence, assumed risk, and contributory negligence.

The appellant offered in evidence the following rules:

"26. A blue flag by day, and a blue light by night, displayed at one or both ends of an engine, car or train, indicates that workmen are under and about it; when thus protected it must not be coupled to or moved. Workmen will display the blue signals, and the same workmen are alone authorized to remove them. Other cars must not be placed on the same track so as to intercept the view of the blue signals, without first notifying the workmen."

"983. When inspecting or repairing cars that they do not wish moved, they must protect themselves by placing conspicuously a blue signal on both ends of the car, as provided in rule 26. When necessary to make repairs on a car in a train, they must place blue signals upon both ends of the train before commencing work. If an engine is attached to it they will place a blue signal upon the engine, where it can be plainly seen by the enginemen and fireman."

It is conceded that Casey had failed to place any blue signals on the cars he was inspecting at the time of his injury. The evidence shows that those coal cars were what are commonly referred to and known among railroad men as "pick-ups"; that is, cars that were to be "picked up" at some point in the yards and incorporated into a train going out. It was further shown that a custom of omitting the display of the blue signals

when "pick-ups" were being inspected had prevailed in those yards for several years; the signals were used by the inspectors only when repairs of some kind were being made. This custom seems to have been known to and recognized by the employés generally, and had existed for such a length of time that the jury might have inferred that it was known to and acquiesced in by the superior officers of the company. The absence of the blue signals on the night of the injury did not, therefore, signify to Iiams and his crew that no inspection was then being made of the coal cars by Casey. The presence of a blue flag, or a blue light, was one method of giving notice to the trainmen and switchmen that inspectors were at work and that the cars were not to be moved. If from some other source or circumstances the switchmen knew or had good reason to believe that inspectors were at work on cars and were likely to be in a place of danger, their conduct in moving the cars without notice might well be regarded as perilous and imprudent, notwithstanding the absence of the customary signals. The question then is: Did Iiams or his crew know or have good reason to believe that Casey was at work on the train of coal cars and likely to be in a place of danger when the second collision occurred which caused the injury? The testimony shows that those coal cars were brought from a distant switch and placed on "long house" track about two or three hours before train 74 came in from the south. There is no evidence that Casey knew that those cars were to be taken out till so informed by Iiams after he and Wilson had completed their inspection of train No. 74. Iiams testified that when he gave Casey that information the latter turned and went in the direction of the coal cars, which were only about 25 feet distant. Casey carried an inspector's light, which differed in some respects from those carried by the switchmen. One witness testified that Iiams could have seen Casey's light had he looked in that direction. Taking into consideration the known duty of Casey, and the other attendant circumstances, we think there was ample ground for the inference that Iiams either knew that Casey was inspecting the coal cars, or had good reason for believing that he was so engaged and likely to be in a place of danger. Ry. Co. v. Reynolds, 103 Tex. 31, 122 S. W. 531. It seems to be admitted that moving cars that are merely being inspected is not necessarily attended with danger, but that coupling the air-hose under such conditions is dangerous.

It is insisted that Casey had been informed of the exact manner in which this work was to be done, and that this was sufficient notice to put him on his guard against a disturbance of the cars. Whatever notice Casey received was embraced in the language used in his conversation with Iiams before Casey began inspecting the coal cars. According to the testimony of the witness Bentley, a member of the switching crew, what Iiams said to Casey meant that the string of cars necessary to be handled in taking the two bad order cars out of train 74 would be shoved in on the "long house" track and left there. It is inferentially assumed by counsel for appellant that this meant that all of the cars on "long house" track would be pushed south until the main line was left clear, necessitating moving the coal cars. It is also assumed that Casey must have known that the coal cars would be disturbed because of his general knowledge of the location and condition of the switch tracks and the then situation of the coal cars. The testimony shows that the north end of these was only about one or two car lengths further south than was necessary to clear the main line. But let us assume that the work was done in the precise manner in which the language of Iiams indicated it would be done; this did not necessarily imply that those coal cars were to be moved before the inspection was completed. Casey might have inferred that Iiams knew that he was going immediately to begin the inspection, and that he would be permitted to finish before the cars were moved. However, as tending to rebut any such inference on the part of Casey, appellant relies upon a custom of long standing prevailing among the yardmen at that place; that was, the practice of switchmen coupling onto "pick-ups" at any time unless a blue signal was displayed, or unless they were notified not to do so. But the evidence does not justify the conclusion that switchmen persisted in doing their work in that manner without reference to the known situation of inspectors. The witness Bentley testified as follows:

"Q. Mr. Bentley, was it, or not, customary in that yard, * * * for the switching crew to shove against pick-ups when you knew that notwithstanding there was not a blue light the inspector was in between them? A. In that case the only thing I can answer, unless he said he was going to inspect the train, we would go ahead and proceed with our work. If we seen him, we would holler at him. If we knew he was there, we would not do it, notwithstanding there was no blue signal. I should not think it was customary for the crew to shove against pick-ups when they believed and understood that an inspector was between the cars."

If that be a correct statement of the custom relied on, it cannot be said as a matter of law that Casey was bound to know that the cars from No. 74 would be shoved against the coal cars without notice of some sort that would enable him to escape danger; for, as we have before stated, the circumstances were such that he might have inferred that his presence there was known to the switching crew, or at least to Iiams.

But it may be said that, if Casey did not know in advance that the cars were to be moved without reference to what his work was, he was fully apprised of that fact when the first collision occurred. That may be true; but, if the conditions which immediate-

ly followed were reasonably calculated to deceive and did mislead him, such notice was insufficient to discharge the duty due to one in Casey's situation. According to Bentley's testimony, after the first collision the coal cars moved about a car length or more and then stopped; and after the passage of a few seconds another collision occurred, and the cars then continued to move on down the track. The interval referred to resulted from the failure of the cars to couple with the first impact, due to the drawbars or knuckles being out of position. Casey was about ten car lengths from the point where the coupling was to be made; and on account of the darkness, doubtless, did not discover that the first attempt to couple had been unsuccessful. He concluded, as his statements to those who gathered around him after the accident indicate, that the switchmen had finished their work when the first collision took place, and that he might proceed with his duties in safety. We cannot say as a matter of law that, under those circumstances, such an inference was unreasonable, or not to be expected by one situated as Iiams was on that occasion, and that ordinary prudence did not require him to give Casey some warning of what the switching crew was about to do. We have therefore concluded that the evidence was sufficient to support the findings that negligence on the part of the switching crew was the proximate cause of the injury. Casey v. Railway Co., 151 S. W. 856; Railway Co. v. Perryman, 160 S. W. 406. The first case cited is this case on a former appeal, where the facts were practically the same.

We are also of the opinion that it cannot be said as a matter of law that Casey was guilty of contributory negligence in going between the cars at the time he did. Assuming that the rules hereinbefore quoted required inspectors to put up signals when performing their work, the evidence in this record shows that a custom had prevailed for a considerable length of time in the yards of the appellant not to apply that rule to "pickups" such as the coal cars were in this instance. The disregard of the rule in that particular was of such long standing and was so well known to the switching crew that the omission of that duty by Casey and his helper would not constitute contributory negligence as a matter of law; and that issue becomes one of fact which the jury had a right to determine as it did.

[4] But it is urged that Casey assumed the risk of being injured when he undertook to inspect the cars without displaying the required signals, after having received the information he obtained from Iiams. It will be observed that we have placed the liability of the appellant upon conduct amounting to negligence on the part of the switching crew in failing to give notice to Casey when they had reason to believe he was inspecting

the cars. The evidence does not warrant the inference that such negligent conduct was the custom in those yards. On the contrary, we must conclude from the testimony of members of the switching crew that, even when no signals were displayed, they usually gave notice to inspectors known to be in places of danger, before moving cars, or refrained from disturbing the cars until after the inspection was completed. We therefore find no basis for the application of the doctrine of assumed risk. The issue of liability depended upon whether or not the members of the switching crew were negligent, and not upon whether Casey was injured by exposing himself to a known risk resulting from habitual negligence on the part of the switchmen, or one that was ordinarily incident to the business. He did not assume the risk of being injured by an isolated act of negligence which he had no reason to anticipate would then occur. T. & P. Ry. Co. v. Eberheart, 91 Tex. 321, 43 S. W. 510; Ft. Worth & Denver City Ry. Co. v. Smith, 39 Tex. Civ. App. 92, 87 S. W. 371.

[5] In submitting the issues of fact the court propounded 24 questions to the jury The appellant presented in writing 10 additional questions, and requested that they also be submitted. This request was refused and that refusal is made the basis of several assignments. Those objections must be disposed of without reference to the merits of the questions involved, because the record contains no bill of exceptions to this ruling of the court. Article 2058 of the Revised Civil Statutes of 1911 provides that:

"Whenever, in the progress of a cause, either party is dissatisfied with any ruling, opinion or other action of the court, he may except thereto at the time the same is made or announced, and at his request time shall be given to embody such exception in a written bill."

Written interrogatories calling for findings of fact by the jury constitute no part of the charge and instructions of the court referred to in chapter 13 of the Revised Civil Statutes. A request of a party that certain questions be propounded is therefore not a request for a special charge. Railway Co. v. Cody, 92 Tex. 623, 51 S. W. 329. Even prior to the amendments of 1913, which require parties to except to the refusal of the court to give special charges, rulings of this character would not be reviewed on appeal unless the objection and ruling were presented in a proper bill of exceptions. There is nothing in those amendments to change the rule. These assignments will therefore not be further considered.

As prefatory to the interrogatories propounded in the trial below, the court gave the jury some general instructions intended for their guidance in determining the issues of fact submitted. These instructions were not confined to definitions of legal terms and phrases, but informed the jury in general terms that the switching crew with which

Casey was at work on the night of the injury owed him the duty of exercising ordinary care to avoid injuring him while he was in the performance of his duty; that a failure to exercise such care would be negligence on their part. The court also told the jury under what circumstances Casey should be considered as · having assumed the risk of being injured by going in between the cars at the time he was injured, that Casey was required to exercise ordinary care for his own safety, and that a failure to exercise such care would amount to contributory negligence on his part. The portions of the charge objected to will not be here reproduced, on account of their length; but what is stated above is sufficient, we think, for the purposes of discussing these assignments. The objections made to this charge may be summarized as follows: (1) That such instructions were unnecessary and confusing to the jury. (2) That they were on the weight of the evidence. (3) That they in effect informed the jury under what conditions or state of facts the plaintiff could, or could not, recover.

[6] Taking these objections in the order stated above, it may be conceded that much of what is embraced in these general instructions might have been omitted without depriving the jury of the information necessary to enable them to properly determine the issues involved. That fact alone does not require a reversal of the judgment. We have carefully examined this charge, and find nothing in it that would tend to confuse or mislead the jury in returning the answers made.

[7] The objection that the charge is on the weight of the evidence is too general. Extensive quotations are made, but there is no effort to point out what particular part is subject to this objection, or in what portion the court invaded the province of the jury.

·[8] The last objection mentioned above is the one that was emphasized in the oral argument before this court. It was then urged that by informing the jury that under a certain state of facts the plaintiff in the suit would recover a judgment, and that under a certain other state of facts she could not recover, the court thereby influenced the jury to find the facts which required a judgment in the plaintiff's favor. This argument is based upon the assumption that the jury would take into consideration the character and conditions of the parties to the suit, and would be moved by a feeling of sympathy for the plaintiff. It may be that in controversies of this character such emotions do sometimes control the verdicts of juries; but, in the absence of some evidence to that effect, we cannot assume that such bias and sympathy existed. The mere finding of facts favorable to the plaintiff is not sufficient when the evidence is of that character which warranted such finding. To gratuitously as-

sume that a jury which has been properly tested and selected yielded to such sympathy, or was probably controlled by such emotions under such conditions, is to impeach the system of trial by jury for being fundamentally unreliable. Where a general verdict is to be rendered, the jury are necessarily informed of what is required to be found in order to entitle either party to a judgment. Evidently the law does not contemplate that such information should be concealed from juries in order to insure absolute impartiality. The error, if any there was in giving this general charge, was harmless and does not warrant a reversal of the judgment.

Appellant presents the following objections to the admission of testimony:

"The court erred in permitting T. M. Bentley to testify as to what the custom of defendant's employés was with reference to coupling to 'pick-ups' in the absence of a blue signal, when they believed an inspector was in between the cars, and in permitting the witness to testify, 'No, sir; I should not think so.'"

We have examined the bill of exception referred to as supporting the objection here urged, and have failed to find where the witness used the language quoted. The bill covers four typewritten pages consisting of several questions, some of which were answered without objection, and others withdrawn upon objection. It is impossible for us to say from this bill that the language pointed out in the assignment was given as a part of this witness' testimony. As to proof of the custom, that appears to have been furnished by the testimony of other witnesses without objection. The next assignment refers to the testimony of another witness, which, it is claimed, was subject to a similar objection. An inspection of the bill itself shows that the objection now insisted on was in effect sustained by the court.

[9] It is also contended that this cause of action was barred by the statute of limitations, because the amended original petition was filed more than two years after the cause of action accrued. The record shows that this suit was originally instituted by Mrs. Casey as the widow of the deceased and the parent of the surviving children. That petition was filed before the expiration of the statutory limit. She subsequently qualified as administratrix, amended her petition, and now prosecutes the suit in the form required by the act of Congress. The case of Railway Co. v. Wulf, 226 U. S. 570, 33 Sup. Ct. 135, 57 L. Ed. 355, Ann. Cas. 1914B, 134, settles that question against the contention of the appellant.

Appellant's brief contains 49 assigned errors, and we have not undertaken to discuss all of them. To do so would extend this opinion to an unreasonable length. But we have carefully considered all of the objections raised, and are of the opinion that they, should be overruled and the judgment affirmed.