EL PASO & S. W. R. CO. v. LOVICK. (No. 933.)

(Court of Civil Appeals of Texas. El Paso. March 6, 1919. Rehearing Denied March 27, 1919.)

1. TIME ⬤═9(1) — COMPUTATION—EXCLUDING FIRST DAY.

An order of the Director General of Railroads dated April 9, 1918, became effective from the first moment of that date and covers all transactions of that date to which it is applicable.

2. RAILROADS ⬤═5½, New, vol. 6A Key-No. Series — ACTIONS AGAINST — GOVERNMENT CONTROL.

Orders Nos. 18 and 18a of the Director General of Railroads dated April 9 and 18, 1918, in so far as they require all suits against carriers under federal control to be brought in county or district where plaintiff resides or resided at the time of the accrual of the cause or in the county or district where the cause arose, is inconsistent with and contrary to Act. Cong. March 21, 1918, § 10 (U. S. Comp. St. 1918, § 3115¾j), providing "actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law."

3. RAILROADS ⬤═5½, New, vol. 6A Key-No. Series—ACTIONS FOR INJURY—ABATEMENT— ORDERS OF THE DIRECTOR GENERAL.

The General Order No. 26 of the Director General of Railroads under federal control, May 23, 1918, ordering that actions and suits included under General Order No. 18 should abate during federal control, is inconsistent with and contrary to Act Cong. March 21, 1918, § 10 (U. S. Comp. St. 1918, § 3115¾j), providing that actions at law or suits in equity may be brought by or against such carriers and judgments rendered as now provided by law.

4. APPEAL AND ERROR ⬤═1043(7)—HARMLESS ERROR — CONTINUANCE — ABSENCE OF WITNESSES.

The overruling of a motion for continuance on ground of absence of witnesses presents no reversible error, where the witnesses were present at the trial and testified.

5. MASTER AND SERVANT ⬤═288(1) — INJURIES TO SERVANT—ASSUMPTION OF RISK— QUESTION FOR JURY.

In an action by a switchman engaged in interstate commerce against a railroad company for personal injuries, evidence held sufficient to go to the jury on the issue of assumed risk.

6. MASTER AND SERVANT ⬤═240(3) — INJURIES TO SERVANT — CONTRIBUTORY NEGLIGENCE.

Where plaintiff, suing for injuries received while working as defendant's switchman, attempted to board the engine at the designated place on the footboard for another switchman, who had assumed plaintiff's station thereon, and was thrown and injured by the other's attempt to assume his proper station, held, that plaintiff was in the exercise of due care.

7. TRIAL ⬤═253(4)—INSTRUCTIONS—IGNORING ISSUES.

In an action by a switchman to recover from railroad company for personal injuries, requested charges which ignored the issue of negligence of a fellow switchman held properly excluded.

8. APPEAL AND ERROR ⬤═231(9)—OBJECTION —SUFFICIENCY.

An objection urged in the court below, that "because paragraph 6 of said charge upon the

subject of assumed risk is erroneous," is too general for consideration upon appeal.

9. DAMAGES ☞132(3)—EXCESSIVE DAMAGES—BROKEN BACK.

Where plaintiff's back was broken and he has suffered and still suffers great pain, his earning capacity has been greatly impaired, and he is deformed and crippled for the balance of his life, a verdict for $22,500 is not excessive.

Appeal from District Court, El Paso County; Ballard Coldwell, Judge.

Suit by Robert L. Lovick against the El Paso & Southwestern Railroad Company. Judgment for plaintiff, and defendant appeals. Affirmed.

W. M. Peticolas and Del W. Harrington, both of El Paso, for appellant.

A. L. Curtis, of Belton, Winbourn Pearce, of Temple, and Geo. E. Wallace, of El Paso, for appellee.

### Statement of Case.

HIGGINS, J. On April 9, 1918, appellee, Lovick, filed this suit in the district court of El Paso county, Tex., against appellant, to recover damages arising from personal injuries. The accident upon which the suit is based occurred at Bisbee, Ariz., on October 7, 1917. At the time of the accident, appellee was in the service of appellant as a switchman in the Bisbee yards. He based his suit upon alleged negligence of W. L. Van Winkle, a fellow switchman, in the manner of the latter boarding the switchboard of a switch engine. Appellee alleged that he was a citizen of Texas, but did not allege the county of his residence either at the time of the accident or at the date upon which the suit was filed.

Appellant filed a plea in abatement setting up the President's proclamation of December 26, 1917, by virtue of which possession had been taken and control of its system of transportation assumed by the government; also, pleading the various acts of Congress and orders of the Director General hereinafter mentioned; that the asserted cause of action arose in Cochise county, Ariz., and at the time of the accident Lovick resided in said county. It was also averred that to try the suit in El Paso county would prejudice the just interests of the government, in that it would be necessary to bring certain witnesses to El Paso county, namely, W. L. Van Winkle, W. G. Grace, switchmen, and R. M. Booker, engineer, all of whom were in appellant's service at and near Cochise county, Ariz., and engaged in hauling war materials, troops, munitions, and supplies. On October 3, 1918, the plea in abatement was overruled. The action of the court upon the plea is the first question presented for review.

### Opinion.

[1] It will be noted that the suit was filed April 9, 1918, which was the date upon which General Order 18 was issued. Under the rule announced in Lapeyre v. United States, 17 Wall. 191, 21 L. Ed. 606, the order became effective from the first moment of that day and covers all transactions of that date to which it is applicable. See, also, United States v. Norton, 97 U. S. 164, 24 L. Ed. 907; Leidigh Carriage Co. v. Stengel, 95 Fed. 637, 37 C. C. A. 210.

[2] By the act of Congress approved August 29, 1916 (chapter 418, 39 Stat. 645 [U. S. Comp. St. 1918, § 1974a]), the President, in time of war, was empowered, through the Secretary of War, to take possession and assume control of any system of transportation and to utilize same for certain purposes therein specified.

This country being at war, the President, by proclamation dated December 26, 1917 (U. S. Comp. St. 1918, § 1974a), took possession and assumed control of each and every railroad transportation system within the boundaries of the continental United States. It directed that the possession, operation, and utilization of such systems should be exercised by and through Wm. G. McAdoo, who was thereby appointed and designated Director General of Railroads. This provision was contained in the proclamation:

"Except with the prior written assent of said Director, no attachment by mesne process or on execution shall be levied on or against any of the property used by any of said transportation systems in the conduct of their business as common carriers; but suits may be brought by and against said carriers and judgments rendered as hitherto until and except so far as said Director may, by general or special orders, otherwise determine."

The act of August 29, 1916, was supplemented by the act approved March 21, 1918 (chapter 25), the eighth, ninth, and tenth sections (U. S. Comp. St. 1918, §§ 3115¾h, 3115¾i, 3115¾j) whereof read:

"Sec. 8. The President may execute any of the powers herein and heretofore granted him with relation to federal control through such agencies as he may determine. * * *

"Sec. 9. The provisions of the act entitled 'An act making appropriations for the support of the Army for the fiscal year ending June thirteenth, nineteen hundred and seventeen, and for other purposes,' approved August twenty-ninth, nineteen hundred and sixteen, shall remain in force and effect except as expressly modified and restricted by this act; and the President, in addition to the powers conferred by this act, shall have and is hereby given such other and further powers necessary or appropriate to give effect to the powers herein and heretofore conferred. The provisions of this act shall also apply to any carriers to which federal control may be hereafter extended.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"Sec, 10. Carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government. Nor shall any such carrier be entitled to have transferred to a federal court any action heretofore or hereafter instituted by or against it, which action was not so transferable prior to the federal control of such carrier; and any action which has heretofore been so transferred because of such federal control or of any act of Congress or official order or proclamation relating thereto shall upon motion of either party be retransferred to the court in which it was originally instituted. But no process, mesne or final, shall be levied against any property under such federal control."

By proclamation dated March 29, 1918 (U. S. Comp. St. 1918, § 3115¾h) the President authorized the Director General:

"To issue any and all orders which may in any way be found necessary and expedient in connection with the federal control of systems of transportation, railroads, and inland waterways as fully in all respect as the President is authorized to do, and generally to do and perform all and singular all acts and things and to exercise all and singular the powers and duties which in and by the said act, or any other act in relation to the subject hereof, the President is authorized to do and perform."

On April 9, 1918, the Director General issued General Order No. 18, the material portion whereof reads:

"Whereas it appears that suits against the carriers for personal injuries, freight and damage claims, are being brought in states and jurisdictions far remote from the place where the plaintiff resides or where the cause of action arose; the effect thereof being that men operating the trains engaged in hauling war material, troops, munitions, or supplies, are required to leave their trains and attend court as witnesses, and travel sometimes for hundreds of miles from their work, necessitating absence from their trains for days and sometimes for a week or more; which practice is highly prejudicial to the just interests of the government and seriously interferes with the physical operations of railroads; and the practice of suing in remote jurisdictions is not necessary for the protection of the rights or the just interests of plaintiffs.

"It is therefore ordered that all suits against carriers while under federal control must be brought in the county or district where the plaintiff resides, or in the county or district where the cause of action arose."

On April 18, 1918, the Director General issued General Order No. 18a, which reads:

"General Order No. 18 issued April 9th, 1918, is hereby amended to read as follows:

"It is therefore ordered that all suits against carriers while under federal control must be brought in the county or district where the plaintiff resided at the time of the accrual of the cause of action or in the county or district where the cause of action arose."

On May 23, 1918, the Director General issued General Order No. 26, the material portions of which read as follows:

"Whereas it appears that there are now pending against carriers under federal control a great many suits for personal injury, freight and damage claims, and the same are being pressed for trial by the plaintiffs in states and jurisdictions far removed from the place where the persons alleged to have been injured or damaged resided at the time of such injury or damage, or far remote from the place where the cause of action arose; the effect of such trials being that men operating the trains engaged in hauling war materials, troops, munitions or supplies, are required to leave their trains and attend court as witnesses, and travel sometimes for hundreds of miles from their work, necessitating absence from their trains for days and sometimes for a week or more; which practice interferes with the physical operation of railroads; and the practice of trying such cases during federal control in remote jurisdictions is not necessary for the protection of the rights or the just interests of plaintiffs:

"It is therefore ordered, that upon a showing by the defendant carrier that the just interests of the government would be prejudiced by a present trial of any suit against any carrier under federal control which suit is covered by General Order No. 18 and which is now pending in any county or district other than where the cause of action arose or other than in which the person alleged to have been injured or damaged at that time resided, the suit shall not be tried during the period of federal control; provided, if no suit on the same cause of action is now pending in the county or district where the cause of action arose, or where the person injured or damaged at that time resided, a new suit may, upon proper service, be instituted therein; and if such suit is now barred by the statute of limitations, or will be barred before October 1, 1918, then the stay directed by this order shall not apply unless the defendant carrier shall stipulate in open court to waive the defense of the statute of limitations in any suit which may be brought before October 1, 1918.

"This order is declared to be necessary in the present war emergency. In the event of unnecessary hardship, in any case either party may apply to the Director General for relief, and he will make such order therein as the circumstances may require consistent with the public interest.

"This order is not intended in any way to impair or affect General Order No. 18 as amended by General Order No. 18a."

This court assumes that the Director General was authorized to issue such executive orders as was necessary to carry out the purpose for which possession was taken of

the transportation systems, not inconsistent with the acts of Congress.

In our opinion the orders relied upon by appellant are inconsistent with and contrary to that portion of the act of March 21, 1918, which provides:

"Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law."

Lovick's cause of action was transitory and maintainable wherever a court might be found having jurisdiction of the parties and subject-matter. Ry. Co. v. Sowers, 213 U. S. 55, 29 Sup. Ct. 397, 53 L. Ed. 695. His right of action arose on October 7, 1917, and, when Congress passed the act of March 21st, he then had the right to institute suit thereon in the district court of El Paso county, Tex., and prosecute the same to judgment. How can the Director General deprive him of the right to resort to that court when Congress has said that his action might be brought as then provided by law? How can his action be stayed by an executive order when Congress has protected his right to the rendition of a judgment as it existed on March 21, 1918.

In the opinion of this court that portion of section 10 above quoted protected plaintiff against executive interference with his right to resort to any court having jurisdiction of the subject-matter and person of defendant and his further right to prosecute his suit to judgment. We regard the language employed as plainly indicative of the congressional intent in this respect. But if this intent and meaning of the act cannot be readily ascertained from the words used, it nevertheless becomes apparent when considered in connection with the antecedent proclamation of the President dated December 26, 1917. In this proclamation the President ordered that, except with the written assent of the Director, no attachment by mesne process or on execution should be levied on or against any of the property used by any of the transportation systems in the conduct of their business as common carriers; but that suits might be brought by and against the carriers and judgments rendered as hitherto until and except so far as the Director might, by general or special orders, otherwise determine. There are two features of the act which obviously relate to that portion of the proclamation. The first is the provision with reference to actions at law, suits in equity, and rendition of judgments. The second is:

"But no process, mesne or final, shall be levied against any property under such federal control."

It is significant that whereas, under the proclamation, suits might be brought against such carriers and judgments rendered as hitherto, until and except as the Director might, by order, otherwise determining, the act itself expressly stipulated that actions at law and suits in equity might be brought against such carriers and judgments rendered as then provided by law, and that, whereas, under the proclamation, mesne process or execution could be levied with the prior written assent of the Director, under the act of Congress it was absolutely forbidden.

These features of the act manifest the interest of Congress to be that under no circumstances was the property of the carriers to be subject to levy and that the right of litigants to bring actions and have judgments rendered as such rights then existed was preserved and protected against future executive interference which was plainly forecast in the proclamation of December 26th.

For the reasons indicated, the trial court did not err in refusing to abate the suit or stay the trial.

[3, 4] Appellant also assigns error to the action of the court in overruling its motion to continue the case during federal control. The motion sets up General Order 26; that W. L. Van Winkle, W. P. Grace, R. M. Booker, and J. H. Smith were material witnesses for defendant; that they resided at Bisbee, Ariz., in the service of defendant, and to bring them to El Paso to testify would prejudice the just interests of the government. What has heretofore been said applies to order 26, but, if the validity of the order should be conceded, the overruling of the motion presents no reversible error for the reason that Grace, Booker, and Smith were in fact present and testified, and Van Winkle was in attendance and could have been placed upon the stand had his testimony been material to the defense. In this condition of the record, the overruling of the motion presents no ground for reversal.

[5] The fourth and fifth assignments assert that the verdict and judgment are contrary to and unsupported by the evidence; the sixth, seventh, and ninth that a peremptory instruction should have been given in defendant's favor. The evidence has been examined, and in our opinion was sufficient to submit to the jury the issue of negligence and that it did not justify the court in assuming as a matter of law that the plaintiff had assumed the risk. The evidence quoted in passing upon the eighth assignment sufficiently shows that the issues of negligence and assumed risk were questions for the jury. For this reason those assignments are overruled.

[6] The eighth assignment reads:

"Because the court erred in the court's charge to the jury because said charge submits the action of the switchman Van Winkle in stepping from the outside of the footboard to the inside as negligence; and in effect submits the manner of so stepping as negligence."

The supporting propositions read:

(1) "It is error for the court to submit, as a question of negligence for the jury to decide, the method alleged to have been employed by a switchman to mount and take his place on the footboard of an engine, when such method is shown by the undisputed testimony of plaintiff's own witnesses to be a customary and usual one in use by the switchmen in the performance of their duties."

(2) "When the only inference that can be reasonably drawn from the evidence is that a switchman, in the performance of a duty incident to his employment, conformed to the general usage of railway employés in performing' such duties, such switchman was, as matter of law, in the exercise of due care."

If the evidence was as indicated by the propositions, reversible error would be presented; but it is not so regarded. That portion of the charge here complained of reads:

"If you find from a preponderance of the evidence that, at the time and place complained of by plaintiff, he was in the act of mounting one of defendant's engine footboards, as alleged by him; and if you further find that one of defendant's switchmen, Van Winkle, stepped from the outside of such footboard to the inside thereof, and that said Van Winkle was negligent in so stepping at the time and place he so stepped, if he did; and you further find that the negligence of said Van Winkle was approximate cause of the injuries to plaintiff complained of by him—you will find for the plaintiff, unless you find for the defendant under some other paragraph of this charge."

At the time of the accident, Lovick and Van Winkle were serving in the same switching crew. Lovick was what is known in switching parlance as the "long field" man; Van Winkle as the "short field" man. The switch engine was backing towards the two men, and in the discharge of their duty they were to board the footboard of the engine as it reached them. They were both on or near the track, Van Winkle being between Lovick and the approaching engine and about 12 or 15 feet closer to the engine than Lovick was. According to the rule and custom, the members of a switching crew as they board the footboard line up on the same; a different place being assigned to each man. The place for the foreman is on the engineer's side of the engine at the outer end; the man that follows the engine is next to him on the same side of the engine and between the foreman's position and the drawbar in the center of the engine; the "long field" man is on the fireman's side of the engine at the outer end of the footboard; the "short field" man is on the same side of the engine and between the long field man and the drawbar in the center. The position, beginning on the fireman's side, is then in this order: The long field man, short field man, the man following the engine, and the foreman with the drawbar separating the second and third mentioned men. The engine does not stop, but the men board it as it is in motion. It is the custom for the men to get on in their designated places. If, for any reason, he gets on out of his designated place, it is the rule and custom and his duty to immediately and without hesitation move thereto; the boarding and moving being a continuous operation. Lovick testified that, when the engine approached, Van Winkle boarded the same in his (Lovick's) designated place on the footboard. He further testified:

"I watched for a second, and he made no effort to move, and that only left me one place, and that was his place; he having got in my place. * * * The instructions were, that is to me, in a way, should you, through error or for any other reason, get on the footboard out of your assigned place or proper place, under no condition, move, unless you were sure all the men were on the footboard or in the clear of the track, for you are liable to kill the others, you having got out of your place, would leave only one place for him, and he would expect to get in that vacant place. Yes, the foreman had instructed me how to get on the engines as they approached, although I needed no special instructions. It was customary in the yards at Bisbee for the switchman, foremen, and yardmen to get on moving engines, and should you fail to you would not accomplish your work, and no foreman would have a man that didn't. I have been working all my life, and I never saw one stop an engine. I have seen General Yardmaster Smith do it many times, and I have been on the footboard with him. Yes, sir; I noticed Van Winkle on in my place, and I couldn't understand what he meant. I watched him a few minutes, and, like I say, he was 12 or 15 feet down the track—I am not positive. I watched him a few minutes; he never turned around, and I couldn't understand. That only left one place for me, and that was the place left vacant by him, so I stepped over to get on the footboard, and, the instant I put my foot up, Van Winkle, without ever turning around, had moved over, and my foot hit his heels and I went under the locomotive. Yes, when I saw Van Winkle occupying my place, and I thought he was not going to move, I stepped over to the place reserved for him. At the time I noticed Van Winkle on the footboard in my place, I was standing at the outer side of the track, which was the proper place for me to be to board the footboard in my place, for the long field man. Mr. Grace had been talking to us just a few minutes prior to the accident. He was close by there. I went under the locomotive, I don't know, it seemed to throw me over three or four times."

The foreman, Grace, also testified:

"If a man would get on here, on the outside. and was intending to move to the center, with a man immediately behind to get on the outside, he would get on with a continuous movement to the center, step there and his next foot would be over here, draw it up that way. Yes, there are two rods there to catch hold of. If he gets on the center, he would make a straight step to the center. Both of those ways are practiced in the yards at Bisbee. If you were going to step up there and remain, of course,

he has something here to hold to, and when he got up he would be in that position (with both feet up). If I was working as long field man and I was standing immediately behind the short field man, and he got on the footboard in that position (last position) and remained stationary, the only thing for me to do would be to step this way and in that position, that would be in the center—that is, if I intended to get on the engine at all and do my work. * * * Assuming that the long field man and the short field man are standing, say, 12 feet apart along the track, with the short field man closer to the engine, it is customary for him to get on the outside of the footboard and then move over next to the drawbar. It is customary for each man, having his designated place on the footboard, either to get on in his designated place or to move to his place immediately, without hesitation. Yes, it is the universal custom, either to get on in his designated place, or immediately to move to that designated place. As I stated, if I were going to get on the engine at all, being the long field man following the short field man who had gotten on the outside of the footboard and remained there, I would get on the center; there wouldn't be anything else to do, under the circumstances, if he wanted to get on. Well, yes; he could have stepped off out of the way and let the engine go by, and, if he had done that, he wouldn't have been run over."

Under the evidence detailed, it will be observed that, when Van Winkle boarded the footboard in Lovick's designated position, it was Van Winkle's duty, under the established rule and custom, to instantly and by one continuous movement move over to his own position. Having failed to do so, Lovick, under the evidence, was in the exercise of due care in attempting to board the engine in Van Winkle's designated place. Van Winkle did not mount and take his position on the footboard in the usual and customary way as is assumed by the propositions relied upon by appellant. Hence the rule of law which they announce is inapplicable.

[7] Error is assigned to the refusal of special charges 3 and 4, which read:

No. 3. "If you believe that it was the habitual and usual custom among the switchmen, and known to the plaintiff, that the short field man should occupy a place next to the drawbar on the footboard, and that the long field man should occupy a place further toward the outside end of the footboard, and you believe that Van Winkle was short field man and Lovick was long field man, and that Lovick saw and knew that Van Winkle had boarded the footboard of the engine, you are instructed that Lovick assumed the risk of attempting to board the footboard next to the drawbar, and your verdict will be for the defendant."

No. 4. "In the event you believe that it was the habitual and usual custom of this and other switch crews known to the plaintiff that the short field man's place on the footboard was next to the drawbar and the long field man's place was further toward the outer end of the footboard, and you believe that Van Winkle was short field man and Lovick was long field man, and believe that Lovick knew that Van Winkle had boarded the footboard and that Lovick attempted to board the footboard from inside the rail, or directly in front of the engine, then you are instructed that he assumed the risk, and your verdict will be for the defendant."

These charges were properly refused, because they ignore the issue of negligence upon Van Winkle's part, presented by that phase of the evidence which shows that since Van Winkle did not promptly move to the center of the footboard next to the drawbar as he should have done, that Lovick had a right to assume that Van Winkle would not so move after stopping, and that he, Lovick, could safely board in the center. There is nothing in the evidence to show that the risk of such negligence on Van Winkle's part was assumed.

[8] The twelfth assignment complains of the sixth paragraph of the court's charge upon assumed risk. The charge sufficiently conveys the correct conception of the doctrine as applied to the facts presented. We do not think the jury was misled thereby. Furthermore, the exception to this portion of the charge as made in the court below is not regarded as sufficiently specific to support the criticism now made. The objection which appellant urged in the court below was: "Because paragraph 6 of said charge upon the subject of assumed risk is erroneous." This objection was too general. The objection which a party has to a charge should be presented to the trial court with sufficient particularity and certainty that the court may see the error, if any, and correct it. The objection made to the court below in this case was too general. Petty v. City of San Antonio, 181 S. W. 224; Steele Co. v. Dover, 170 S. W. 809; Ry. Co. v. Petersikka, 176 S. W. 70; Ry. Co. v. Thomas, 175 S. W. 822; Ry. Co. v. Casey, 172 S. W. 729.

[9] The thirteenth and fourteenth assignments complain, respectively, of argument of counsel and excessiveness of the verdict and judgment. These are regarded as without merit. Plaintiff's back was broken. He has suffered and still suffers great pain. His earning capacity has been greatly impaired. He is deformed and crippled for the balance of his life. A verdict for $22,500 is not excessive.

Affirmed.